IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WENDELL TABB,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )        1:17CV730
                                       )
BOARD OF EDUCATION OF THE              )
DURHAM PUBLIC SCHOOLS,                 )
                                       )
            Defendant.                 )


**<u>MEMORANDUM OPINION AND ORDER</u>**

**OSTEEN, JR., District Judge**

Currently before this court is Defendant Board of Education of the Durham Public Schools' Motion to Dismiss Plaintiff Wendell Tabb's claims for employment discrimination in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203(a). (Doc. 18.) Defendant has filed a brief in support of its motion to dismiss, (Mem. of Law in Supp. of Mot. to Dismiss ("Def.'s Mem.") (Doc. 19)); Plaintiff has responded, (Doc. 20); and Defendant has replied, (Doc. 21). For the reasons that follow, this court finds that Defendant's motion to dismiss should be granted in part and denied in part as set forth herein.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts, construed in the light most favorable to Plaintiff, are as follows. Plaintiff has been employed at Hillside High School ("Hillside") in Durham, North Carolina since 1987, first as a drama teacher and then as the Theater Director. (Amended Complaint ("Am. Compl.") (Doc. 14) ¶¶ 24, 42.) As Theater Director, Plaintiff has produced numerous plays and won national recognition for his work with the Hillside drama department. (Id. ¶¶ 28, 32.)

Plaintiff is compensated by Defendant according to a salary schedule for public school teachers and also receives a local teacher supplement "based upon years of experience and advanced degrees." (Id. ¶¶ 33–34.) Plaintiff admits that both his base compensation and local teacher supplement are equivalent to those received by other similarly-qualified theater teachers in the district, and therefore does not dispute these parts of his compensation in this case. (Id. ¶¶ 35–36.) In addition to the local teacher supplement, which is determined by experience and education, Defendant also provides discretionary supplemental pay to teachers who work with students outside of traditional school hours. (Id. ¶¶ 37–40.) These supplements are based on the nature of the work. For example, there are separate supplements for: Theater Director work — directing and producing plays;

Technical Theater Director ("Technical Director") work — running lights and sets for plays; and for faculty members who coach athletic teams after school. (Id. ¶¶ 38–39.)

Since at least the 2005–2006 school year, Plaintiff has been the sole drama faculty member at Hillside.[1] (Id. ¶ 42.) Three other high schools in the Durham school district, Riverside High School ("Riverside"), Durham School of the Arts ("DSA"), and Jordan High School ("Jordan"), each employed a Technical Director to assist a white Theater Director at some point since 2005-2006.[2] (Id. ¶¶ 76–101.) A Technical Director assists with "lighting, sound, sets and other technical duties

---

[1] Plaintiff does not specify the year that he became Theater Director at Hillside. To construe the Amended Complaint favorably to Plaintiff, this court will assume that Plaintiff was Theater Director from 2005 until the present (covering all potentially relevant comparators).

[2] Plaintiff notes that Hillside's student body is approximately 80% African-American, (id. ¶ 59), while Riverside, DSA, and Jordan each have student bodies consisting of between 35.8 and 43.6% African-American students. (Id. ¶ 61.) This court does not find the racial makeup of the respective schools relevant to Plaintiff's own discrimination claim. See 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . .") (emphasis added); Coleman v. Md. Ct. of App., 626 F.3d 187, 190 (4th Cir. 2010) (stating that a Title VII plaintiff must show "different treatment from similarly situated employees outside the protected class") (emphasis added).

necessary to stage high-quality theatre productions." (Id.
¶ 42.) For example, since at least 2005, Riverside employed a
Technical Director to assist Theater Director Key Strong. (Id.
¶ 76.) From the allegations in the Amended Complaint, it appears
that Jordan employed a Technical Director to assist white
Theater Director Artie Kline at some time between 2005 and 2017.
(Id. ¶ 99.) Since 2005, DSA has continually employed two Theater
Directors, one for the middle school and one for the high
school, and a Technical Director. (Id. ¶ 90.) DSA currently
employs four faculty in its drama department, having recently
hired an additional teacher who receives a Theater Director
supplement. (Id. ¶ 92.)

Plaintiff performs the role of Technical Director in
addition to his normal work directing and managing plays. (Id.
¶ 42.) Because of these additional responsibilities, Plaintiff
consistently works large amounts of overtime. (Id. ¶ 43.)
Defendant has also requested that Plaintiff work overtime
without added pay to keep the Hillside theater open for special
events and ceremonies. (Id. ¶ 130.) Plaintiff has asked
Defendant for funding to hire a Technical Director, which
Defendant has not provided. (Id. ¶ 45.) Plaintiff has also
requested that Defendant pay him a Technical Director supplement
and extra-duty pay for special event-related overtime, which

Defendant has refused to do. (Id. ¶ 44–49.) Defendant did increase Plaintiff's base pay in October 2016 and provided Plaintiff with "an extra-duty pay form to compensate him for a non-theatre-related short-term task" sometime in 2017. (Id. ¶¶ 167–69.)

Plaintiff's son, Emmanuel, suffers from congenital physical disabilities. (Id. ¶ 102.) Emmanuel attended the Durham Public Schools until at least April 2005, when a school therapist working with Emmanuel taped his mouth shut during class. (Id. ¶¶ 103–04.) In May 2006, Plaintiff and his wife sued the Durham Superintendent and Board of Education on behalf of their son for assault and intentional infliction of emotional distress, among other claims. (Id. ¶ 105.) The case received significant press attention and brought negative publicity to the Durham school system. (Id. ¶¶ 107–114.) The case settled in 2009 for $75,000. (Id. ¶ 119.) Assistant Superintendent Thomas Crabtree, who was deposed in that lawsuit, later denied Plaintiff's repeated requests for a Technical Director and additional compensation. (Id. ¶¶ 115–17, 120.)

## II.  **STANDARD OF REVIEW**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal,

556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In other words, the plaintiff must plead facts that "allow[] the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556–57).

When ruling on a motion to dismiss, this court must accept the complaint's factual allegations as true. Iqbal, 556 U.S. at 678. Further, "the complaint, including all reasonable inferences therefrom, [is] liberally construed in the plaintiff's favor." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004) (citation omitted). Despite this deferential standard, a court will not accept mere legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." Iqbal, 556 U.S. at 678.

Employment discrimination complaints must meet the Twombly/Iqbal plausibility standard; however, the plaintiff is not required to make out a prima facie case or satisfy any heightened pleading requirements at the motion to dismiss stage. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002); McCleary-

Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d
582, 584–85 (4th Cir. 2015). The plaintiff is, however, required
to plead facts that permit the court to reasonably infer each
element of the prima facie case, including less favorable
treatment than similarly-situated employees outside of the
protected class. McCleary-Evans, 780 F.3d at 585; see also
Iqbal, 556 U.S. at 682–83 (plaintiff must plead facts supporting
reasonable inference of discriminatory intent); Coleman, 626
F.3d at 191 (stating that a complaint must "assert facts
establishing the plausibility" that plaintiff was terminated
based on race). Once the plaintiff has made a plausible showing
of each element, the claim will survive a motion to dismiss and
the burden then shifts to the defendant to provide "some
legitimate, nondiscriminatory reason" for the disparate
treatment. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802
(1973).

## III. **FILING REQUIREMENTS AND STATUTE OF LIMITATIONS**

### A. **Timeliness of Plaintiff's Claims**

Plaintiff brings his employment discrimination claim in
part under Title VII of the Civil Rights Act of 1964. The
enforcement provisions of Title VII state that "[a] charge under
this section shall be filed within one hundred and eighty days
after the alleged unlawful employment practice occurred." 42

U.S.C. § 2000e-5(e)(1); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109–10 (2002) (stating that "a litigant has up to 180 or 300 days after the unlawful practice happened to file a charge with the EEOC," depending on whether the litigant also files their complaint with a state agency). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113. While Defendant does not contest the timeliness of Plaintiff's claims, this court will briefly examine whether Plaintiff has satisfied this threshold requirement.

Here, Plaintiff's discrimination claim is based on Defendant's denial of additional drama staff and extra compensation, a series of discrete acts.[3] Plaintiff filed his Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 12, 2016. (Am. Compl. (Doc. 14) ¶ 165.) For the 300-day period to apply, Plaintiff must allege that he cross-filed a discrimination charge with a North Carolina state agency in addition to filing an EEOC charge.

_____

[3] Plaintiff alleges a series of discrete acts rather than a hostile work environment. See Morgan, 536 U.S. at 114–15 (describing the difference between these two claims, explaining that a hostile work environment occurs when discriminatory or offensive comments pervade the workplace). This distinction is important because hostile work environment claims are not time-barred even if certain events fall outside the statutory period.

Compare Morgan, 536 U.S. at 114 ("Because Morgan first filed his charge with an appropriate state agency, only those acts that occurred 300 days before February 27, 1995, the day that Morgan filed his charge, are actionable.") with Cravey v. Univ. of N.C. at Chapel Hill, 1:17CV1014, 2018 WL 4471732 at *1, *4 (M.D.N.C. Sept. 18, 2018) (slip op.) (stating that 180-day period applies where plaintiff filed only an EEOC charge). Because Plaintiff states only that he filed an EEOC charge, and does not mention a state agency filing, this court concludes that the relevant time period is 180 days.

Plaintiff describes multiple requests for additional staffing and pay made to Defendant's administrators within the 180-day window immediately prior to his EEOC filing date. (See Am. Compl. (Doc. 14) ¶¶ 157-60.) Each refusal by Defendant within this time period is a discrete actionable event. Morgan, 536 U.S. at 114. Therefore, this court finds that Plaintiff's claims are timely filed pursuant to 42 U.S.C. § 2000e-5(e)(1).[4]

As for Plaintiff's § 1981 claim, 42 U.S.C. § 1981 does not contain an independent statute of limitations. Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369, 371 (2004). However, 28

---

[4] The parties do not appear to dispute that Plaintiff has satisfied Title VII's requirement that he exhaust any administrative remedies prior to filing suit. See Chacko v. Patuxent Inst., 429 F.3d 505, 508-10 (4th Cir. 2005).

U.S.C. § 1658, passed in 1990 and enacted in 1991, specifies a four-year statute of limitations for any "civil action arising under an Act of Congress enacted after the date of the enactment of this section." 28 U.S.C. § 1658. The Supreme Court has found that, because § 1981 was expanded by legislative action in 1991 to cover racial discrimination in any term or benefit of employment, the four-year federal statute of limitations applies to § 1981 race discrimination claims. R.R. Donnelly, 541 U.S. at 383–84. Plaintiff lists multiple denials of technical staffing, technical compensation and overtime in the four-year period prior to the date when Plaintiff filed his complaint in this matter (October 11, 2013 to October 11, 2017). (See Am. Compl. (Doc. 14) ¶¶ 151–60.) Therefore, Plaintiff's § 1981 claim is also timely.

**B.** **Statute of Limitations**

As described above, the applicable time limitation for Plaintiff's Title VII claim is 180 days and the statute of limitations for Plaintiff's § 1981 claim is four years prior to the filing date.

For Title VII, the 180-day window "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Zipes v. Trans World Airlines, Inc., 455

U.S. 385, 393 (1982) (footnote omitted). Because the 180-day limit is not a jurisdictional requirement, it follows that courts should not <u>sua sponte</u> dismiss those claims or pieces of claims that fall outside of the relevant time window, without action by the defendants contesting their timeliness. <u>See</u> <u>id.</u> at 398 (describing the holding in <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807 (1980); observing that the Supreme Court did not dismiss plaintiff's untimely claims <u>sua sponte</u>, but rather assumed jurisdiction over all claims because the employer did not assert the affirmative defense). In a similar way, the § 1981 statute of limitations is an affirmative defense that must be raised by the defendant, either in the answer or in a motion to dismiss. Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations."); <u>see also</u> <u>Eriline Co.</u> <u>S.A. v. Johnson</u>, 440 F.3d 648, 653–54 (4th Cir. 2006) ("Where a defendant has failed to raise a statute of limitations defense by way of its answer, the defense is usually waived.").

Claims ordinarily are not dismissed due to statute of limitations at the motion to dismiss stage, unless "the facts necessary to conclude that plaintiff's claims are barred by the statute of limitations" are clearly set forth on the face of the complaint. <u>Goodman v. Praxair, Inc.</u>, 494 F.3d 458, 464 (4th Cir.

2007); see also Richmond, Fredericksburg & Potomac R.R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993) (stating that statute of limitations "defense may be raised under Rule 12(b)(6), but only if it clearly appears on the face of the complaint") (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)).

Plaintiff includes comparisons to other district high schools that are potentially outside of the relevant statutes of limitation. For example, Plaintiff refers to drama staffing prior to 2013 and, in certain places, fails to allege with specificity when critical hiring decisions or resignations occurred. (See, e.g., Am. Compl. (Doc. 14) ¶¶ 76–79 (describing drama department staffing at Riverside prior to 2012, which is outside the statutes of limitation for both Title VII and § 1981.)) At a later point in this case, it may become clear through discovery that certain or all of these events cannot form the central basis for Plaintiff's discrimination claim. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) (stating that claims falling outside the statute of limitations "are barred, but a discriminatory allegation may still constitute relevant background evidence for valid claims").

However, it is not clear from the face of the Amended
Complaint that any specific comparators are time-barred.[5]
Defendant also failed[6] to raise statute of limitations as an
affirmative defense in its motion to dismiss. (See generally
Def.'s Mem. (Doc. 19).) While Defendant may still raise this
defense in its answer, see Fed. R. Civ. P. 8(c)(1), this court
will not presently dismiss sua sponte any claims (in whole or in
part) as untimely. See, e.g., Eriline, 440 F.3d at 654 ("[T]he
statute of limitations bears the hallmarks of our adversarial

---

[5] As far as this court can discern, the key events from a
statute of limitations perspective are: (1) as to Riverside, the
time at which Monique Taylor was hired to replace Wes Schultz,
and (2) as to Jordan, the time at which the school's previous
white Theater Director retired or was let go and Olivia Garcia
Putnam became Theater Director. (Am. Compl. (Doc. 14) ¶¶ 80,
99.) Plaintiff fails to state with specificity when either of
these events occurred, and each potentially occurred within the
four-year § 1981 window. Therefore, the statute of limitations
defense is not clearly apparent from the face of the complaint
and is not relevant at this stage of the proceedings. This court
finds that DSA is not an appropriate comparator, as described in
Section IV.B.2 below.

[6] Defendant does argue, as to Plaintiff's compensation
claim, that this claim is "untimely to the extent it is premised
upon events more than 300 days prior to his EEOC filing."
(Def.'s Mem. (Doc. 19) at 13.) But because Plaintiff alleges
continuous and ongoing compensation discrimination, (see Am.
Compl. (Doc. 14) ¶¶ 41-43), Plaintiff's claim is in fact
premised upon events occurring within the relevant time window.
See Bazemore v. Friday, 478 U.S. 385, 395-96 (1986) ("Each
week's paycheck that delivers less to a black than to a
similarly situated white is a wrong actionable under Title
VII . . . ."). This sentence also does not raise the statute of
limitations defense as to Plaintiff's staffing claim.

system of justice, a system in which the parties are obliged to present facts and legal arguments before a neutral and relatively passive decision-maker.").

## IV.  **EMPLOYMENT DISCRIMINATION UNDER TITLE VII AND § 1981**

Title VII and 42 U.S.C. § 1981 each prohibit employment discrimination on the basis of race. 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981. A race-based employment discrimination claim must assert that the plaintiff "belongs to a racial minority" and was either not hired, fired or suffered some adverse employment action due to his race. McDonnell Douglas, 411 U.S. at 802; see also Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 n.1 (4th Cir. 2002) (stating that the legal standard is the same under both statutes).

Employment discrimination claims ordinarily deal with "ultimate" employment decisions — the employer's decision to hire, fire, promote or demote an employee. Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981). However, Title VII liability also extends to any "adverse employment action" that had "some significant detrimental effect on [the employee]."[7] Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999). Adverse employment

---

[7] Boone and its progeny expanded the holding in Page and extended potential Title VII liability to a new category of employer actions.

actions include any "acts or harassment [that] adversely effected 'the terms, conditions, or benefits' of the plaintiff's employment." Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001) (quoting Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 243 (4th Cir. 1997)), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62, 66–68 (2006).[8]

The Fourth Circuit has further held that neither "trivial discomforts endemic to employment" nor reassignments that cause a modest increase in stress are adverse employment actions. See Boone, 178 F.3d at 256 ("Absent evidence that a new position is significantly more stressful than the last, vague allegations of stress resulting from reassignment cannot support a claim of discrimination under Title VII."); see also James v. Booz-Allen Hamilton, Inc., 368 F.3d 371, 375–76 (4th Cir. 2004) (finding that plaintiff must show a "decrease in compensation, job title, level of responsibility, or opportunity for promotion") (quoting

---

[8] Von Gunten was brought under Title VII's anti-retaliation provision, and the Fourth Circuit held that the adverse employment action standard applied to retaliation claims. The Supreme Court subsequently ruled, in response to a circuit split on the issue, that retaliation claims should be evaluated under a different, lower standard than discrimination claims. Burlington N. & Santa Fe, 548 U.S. at 67. However, to the extent that Von Gunten defines an "adverse employment action," it remains relevant for non-retaliatory Title VII claims to which this standard still applies.

Boone, 178 F.3d at 256). Title VII liability extends to the provision of a "benefit that is part and parcel of the employment relationship," even if the employer "is under no obligation to furnish [the benefit] by any express or implied contract." Hishon v. King & Spalding, 467 U.S. 69, 75 (1984).

Other circuits to confront the issue directly have concluded that the discriminatory denial of overtime pay to an employee is an adverse employment action. See, e.g., Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 848 (9th Cir. 2004) (finding that the disparate treatment of workers with regard to overtime, including denying overtime compensation, was an adverse employment action); Austin v. Ford Models, Inc., 149 F.3d 148, 153-54 (2d Cir. 1998) (holding that the alleged discriminatory denial of overtime to black workers supported a prima facie Title VII claim, despite employer's compliance with the Fair Labor Standards Act), abrogated on other grounds by Swierkiewicz, 534 U.S. 506 (2002).

The judicial inquiry into whether a certain allegedly discriminatory practice amounts to adverse employment action normally focuses on whether the practice is sufficiently detrimental to the employee. See, e.g., Boone, 178 F.3d at 256-57. However, it is implicit in the inquiry that the employer must initiate the practice with some affirmative action or

imposition on the employee. All Fourth Circuit cases that analyze this piece of a Title VII employment claim, even those that find no adverse action, deal with events that were initiated by the employer and where compliance by the employee was a condition of continued employment. See Boone, 178 F.3d at 255 (employer re-assigned employee to work in a wind tunnel); James, 368 F.3d at 376 (employer re-assigned employee and excluded employee from meetings and conferences); Von Gunten, 243 F.3d at 867 (employer withdrew certain benefits, downgraded and reassigned employee, and allegedly imposed various administrative irritants upon employee). Notably, none of these decisions involve employee hardship caused by self-imposed standards or extra work that the employee was personally motivated to perform.

An adverse employment action Title VII claim includes the following elements: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman, 626 F.3d at 190; see also Love-Lane v. Martin, 355 F.3d 766, 787 (4th Cir. 2004).

### A.  Adverse Employment Action

As a preliminary matter, this court finds that Plaintiff satisfies the first two elements of the Title VII prima facie

test: Plaintiff is African-American and thus a member of a protected class, Love-Lane, 355 F.3d at 787, and there is no apparent dispute as to the quality of Plaintiff's job performance.

### 1. **Technical Supplement**

Plaintiff alleges that Defendant's failure to provide a technical supplement, which caused Plaintiff to carry a disproportionately heavy workload relative to other district Theater Directors, constitutes adverse employment action. In support of this argument, Plaintiff cites several Second Circuit cases finding an adverse employment action under similar circumstances. See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 88–89 (2d Cir. 2015) (holding that the disproportionate assignment of Spanish-speaking students to a Hispanic teacher created substantial additional work and was an adverse employment action); Feingold v. New York, 366 F.3d 138, 152–53 (2d Cir. 2004) (stating that "a disproportionately heavy workload" is an adverse employment action under Title VII).

The Fourth Circuit, however, has not explicitly acknowledged that an employer's assignment of disparate workloads, standing alone, is an adverse employment action. See Boone, 178 F.3d at 257 (stating that "modest stress not present in the old position" is not sufficient to bring a Title VII

discrimination claim). The Fourth Circuit has held that only employer actions affecting the "terms, conditions, or benefits" of employment are cognizable and only when such actions have a verifiable and quantifiable negative impact on the employee's safety, stress or career prospects. See id. at 256-57 (reassignment generally must lower the employee's responsibility level, title, compensation, or career prospects to be cognizable); see also James, 368 F.3d at 376; Von Gunten, 243 F.3d at 866-69 (finding that the temporary withdrawal of minor employment benefits, strict enforcement of administrative rules against employee, and reassignment with no obvious detrimental effect did not amount to adverse employment action).

In any event, the adverse action must clearly be an affirmative act by the employer and not a self-imposed standard or an independent decision to work harder or longer than other similarly-situated employees. See Boone, 178 F.3d at 256 (stating that Title VII applies "only against employers who are proven to have taken adverse employment action") (emphasis added) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 523-24 (1993)). Here, Plaintiff has not alleged that the technical work he performed was required as a condition of his employment; rather, he alleges only that he has worked overtime to handle "the lighting, sound, sets and other technical duties

necessary to stage high-quality theatre productions." (Am. Compl. (Doc. 14) ¶ 42.) Plaintiff fails to allege that Defendant expected or required him to work these hours or to produce plays with high-quality technical features. Plaintiff's independent decision to produce high-quality plays, while laudable, was a decision he made for the benefit of his students rather than a task he performed as a requirement of his position. Plaintiff's internal motivation to work long hours cannot support his discrimination claim without plausible allegations of an employer's coercion or requirement as a job responsibility. Therefore, this court finds that Defendant's alleged failure to pay Plaintiff a technical supplement does not constitute an adverse employment action under Title VII or § 1981.[9]

## 2. **Technical Staffing**

This court finds that the denial of technical staffing alleges an affirmative act by the employer and thus constitutes

---

[9] Assuming for argument that the denial of a technical supplement is adverse action, Plaintiff has failed to allege that a single white Theater Director was paid such a supplement at any time. Plaintiff identifies only one similarly-situated Theater Director without technical assistance, Olivia Garcia Putnam at Jordan. But Putnam is white, and Plaintiff does not allege that she is paid a technical supplement. (See Am. Compl. (Doc. 14) ¶¶ 99-101.) Therefore, Plaintiff cannot plausibly show that Defendant has denied him a technical supplement due to his race.

an adverse employment action. Where an employer chooses to provide a benefit to certain employees and does so in an allegedly discriminatory manner, this action is cognizable under Title VII and § 1981.

Here, Defendant was under no obligation to provide technical staffing assistance to any district theater departments. However, once an employer offers a benefit to certain employees, it assumes the obligation to do so in a non-discriminatory manner. See Hishon, 467 U.S. at 75 ("A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all."); see also Gerner v. Cty. of Chesterfield, 674 F.3d 264, 267 (4th Cir. 2012) (stating that "courts have consistently recognized that the discriminatory denial of a non-contractual employment benefit constitutes an adverse employment action").

In Hishon, a female lawyer sued her former employer, a large law firm, alleging gender discrimination in its decision to deny her partnership. 467 U.S. at 71–72. While the firm was not required to offer partnership to anyone, once it did decide to consider associates for partnership it assumed the legal obligation to provide this benefit in a non-discriminatory

manner. In a similar way, once Defendant decided to employ
Technical Directors at district high schools, it became
obligated to do so without discriminating based on race. The
alleged denial of technical staff to Plaintiff based on his race
constitutes adverse employment action, at least for purposes of
plausibly pleading a discrimination claim.

### 3. **Special Event Overtime**

This court will turn next to Plaintiff's special event-
related overtime claims. Plaintiff alleges that Defendant
requested he work overtime to keep the Hillside theater open for
various special district events. (Am. Compl. (Doc. 14) ¶¶ 127-
28.) Plaintiff states that he was required to perform these
tasks "as a condition of continued employment." (Id. ¶ 127.)
Because Plaintiff has alleged that he was required to work
overtime, the detrimental effects of this overtime work can
properly be attributed to affirmative acts by Defendant. While
these actions by Defendant did not fundamentally alter the
nature of Plaintiff's responsibilities, they were more than
"trivial discomforts" and created the type of significant stress
that the Fourth Circuit has suggested qualifies as adverse
employment action. See Boone, 178 F.3d at 256. Plaintiff was not
merely irritated by new duties or burdensome administrative
tasks — rather, Plaintiff has alleged concrete injury in the

form of mandatory night and weekend work that other Theater Directors were allegedly not required to perform. This court finds that Defendant's repeated requests that Plaintiff perform uncompensated overtime work for special district events, as plausibly alleged, is adverse employment action.

**B.    Plausibility**

Defendant's refusal to provide technical staff or pay overtime for special event-related work each constitute an adverse employment action. However, Plaintiff still must plead facts supporting a plausible inference that he was treated differently than similarly-situated non-black employees of Defendant due to his race. To be clear, Title VII plaintiffs are not required to provide direct evidence of an employer's discriminatory intent. Sterling v. Tenet, 416 F.3d 338, 345 (4th Cir. 2005). Rather, Plaintiff must "allege facts sufficient to claim that the reason [for the adverse employment action] was because of [the plaintiff's] race . . . ." McCleary-Evans, 780 F.3d at 585; see also Coleman, 626 F.3d at 190-91 ("[A]lthough Coleman's complaint conclusorily alleges that Coleman was terminated based on his race, it does not assert facts establishing the plausibility of that allegation.").

### 1. **Plausibility in the Race Discrimination Context**

Determining plausibility in the racial discrimination context is complex because actual proof of racial bias is often elusive and entities may proffer seemingly legitimate pretextual reasons for discriminatory behavior. The relevant question in this case is whether Plaintiff has plausibly alleged that Defendant treated similarly-situated white teachers more favorably. See Woods v. City of Greensboro, 855 F.3d 639, 641 (4th Cir.), cert. denied sub nom., City of Greensboro v. BNT Ad Agency, LLC, _____ U.S. _____, 138 S. Ct. 558 (2017) ("Woods") ("The key issue in this case is . . . whether the City would contract with BNT on the same conditions and under substantially the same circumstances as it would with a nonminority-owned business."). In this court's view, Plaintiff must make three specific showings to plausibly allege discrimination. First, Plaintiff must allege the existence of nonminority comparators – white teachers at other district schools with the same level of responsibility as Plaintiff (i.e., Theater Directors). Second, Plaintiff must allege that Defendant extended favorable treatment to these nonminority comparators, in the form of compensation or staffing assistance, that it did not extend to Plaintiff.

Finally, if the plausibility inquiry is to have any meaning, Plaintiff's allegations must also show that discrimination is a more likely reason for this disparate treatment rather than any other "obvious alternative explanation" that is present on the face of the complaint and "justified by [] nondiscriminatory intent." See, e.g., Iqbal, 556 U.S. at 682 (explaining that any detention policy post-9/11 would reasonably be expected to have a non-discriminatory disparate impact on Arab Muslims because the attacks were perpetrated by Al-Qaeda, an Islamist group); Twombly, 550 U.S. at 567 ("[A] natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing."); Woods, 855 F.3d at 649 (finding that a study showing statistical disparities in number of city contracts offers based on race of business applicants informed the "'common sense' analysis of whether BNT's allegations are plausible") (quoting Iqbal, 556 U.S. at 679); McCleary-Evans, 780 F.3d at 588 ("[T]he cause that [the plaintiff] asks us to infer (i.e., invidious discrimination) is not plausible in light of the obvious alternative explanation that the decisionmakers simply judged those hired to be more qualified and better suited for the

positions.") (citing Iqbal, 556 U.S. at 682) (internal
quotations omitted).

This court further notes the Fourth Circuit's explicit
directive that "evidentiary determinations regarding whether the
comparators' features are sufficiently similar to constitute
appropriate comparisons generally should not be made at" the
motion to dismiss stage. Woods, 855 F.3d at 650. For example, in
Woods, the plaintiffs claimed racial discrimination when the
City of Greensboro reneged on a potential loan to plaintiffs'
business, allegedly because of concerns about the security
guaranteeing the loan. Id. at 642-44. The plaintiffs alleged
that the City had extended loans to similarly-situated
nonminority businesses. Id. at 650. The Fourth Circuit held that
it was not appropriate to consider the specific factual
circumstances surrounding these comparator loans, such as
whether the comparators received loans through a different
funding program, whether the money was extended as a grant
rather than a loan, or whether different financial
considerations were at play, at the motion to dismiss stage.
Id.; see also Woods v. City of Greensboro, 1:14CV767, 2015 WL
8668228 at *1, *10 (M.D.N.C. Dec. 11, 2015).

This court interprets the Woods holding as follows: while
it is permissible to consider the existence of comparators

themselves (i.e., whether a comparator is actually a nonminority and occupies the same position vis-à-vis the defendant as plaintiff), it is not permissible to consider comparator-specific facts other than racial identity or position, even if such facts are alleged in the complaint or responsive pleadings. However, the holding in <u>Woods</u> does not preclude this court from considering obvious non-discriminatory alternative reasons for any disparate treatment; indeed, this cannot be the case given the numerous approving citations to <u>Twombly</u> and <u>Iqbal</u> in the <u>Woods</u> opinion. <u>See, e.g.</u>, <u>Woods</u>, 855 F.3d at 647, 648, 649, 652. This court thus concludes that it may consider alternative explanations for the alleged discriminatory conduct when those explanations are obvious from the face of the complaint and relate to general practices of the defendant (applicable to all comparators) rather than to comparator-specific facts.

For example, in <u>Woods</u>, it would have been permissible to consider (if alleged in the pleadings) that the City's small business lending program had decided to focus its funding efforts on IT and digital technology rather than traditional mediums such as television and radio; this general focus would have impacted all loans extended through the program and offered a potentially legitimate non-discriminatory reason for denying plaintiffs' loan. It was not, on the other hand, permissible to

consider comparator-specific differences such as whether the nonminority loan in question was in fact a loan or a grant. Here, we may consider alternative explanations for disparate treatment when they relate to Defendant's funding and administrative decisions generally (i.e., a district-level decision to establish magnet schools focused on performing arts), but not when they are based on comparator-specific facts (i.e., a certain school's size or the average number of plays produced at a certain school per year).

Applying these principles, this court will proceed to evaluate Plaintiff's technical staffing and special event-related overtime claims. In terms of staffing assistance, this court finds that Plaintiff has identified two comparators that provide a plausible basis from which to infer racial discrimination. This court further finds that Plaintiff has plausibly alleged discriminatory treatment in the payment of overtime, but not in the volume of overtime requests.

## 2. <u>Technical Staffing</u>

Plaintiff has alleged that he was denied a Technical Director, despite repeated requests to Defendant, while other white Theater Directors in the district were permitted to hire Technical Directors. At certain times within the past thirteen years, both Riverside and Jordan employed a white Theater

Director who was assisted by a Technical Director. From 2005 to 2006, Riverside employed a single white Theater Director and a Technical Director. (Am. Compl. (Doc. 14) ¶ 76.) And from 2007 to 2012, Riverside had two white Theater Directors and a Technical Director. (Id. ¶¶ 77–79.) Plaintiff alleges that Jordan "[h]istorically" employed a series of white Theater Directors who were assisted by a Technical Director, Olivia Garcia Putnam (now the Theater Director and sole drama faculty member). (Id. ¶¶ 98–99.) This court finds that Plaintiff has plausibly alleged the existence of similarly-situated nonminority comparators at both Riverside and Jordan and has plausibly alleged that he was treated less favorably than these comparators. Therefore, to the extent that Plaintiff's staffing denial claim relates to comparisons with Riverside and Jordan, Defendant's motion to dismiss this claim will be denied.[10]

As to DSA, Plaintiff alleges that DSA has consistently employed three to four white faculty in its drama department: two Theater Directors, a Technical Director, and a recent hire who receives a Theater Director supplement. (Id. ¶¶ 90–92.)

---

[10] As noted in Section III.B, Defendant has not raised statute of limitations as a defense at this stage of the proceedings and this court possesses insufficient information from the Amended Complaint to conclude that any staffing claims are barred under a statute of limitations analysis.

Plaintiff states that "DSA is part of a magnet program for arts and drama," (Am. Compl. (Doc. 14) ¶ 94), and the DSA website describes the school as a "[s]pecialized visual and performing arts secondary school for grades 6-12 focused on rigorous academics and excellence in the visual and performing arts."[11] See Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, [courts] may properly take judicial notice of matters of public record.").

This court finds that Defendant's decision to operate magnet high schools focused on a particular educational area or specialty constitutes a district-wide administrative decision that may be considered at the motion to dismiss stage. This decision provides an obvious alternative explanation for increased drama department staffing at DSA: the school's focus

---

[11] See "Durham School of the Arts — Magnet and Lottery Information," available at https://www.dpsnc.net/domain/862. The website also states that each DSA high school student is required to focus in one of five "arts concentration areas," one of which is "theatre." Id. Plaintiff alleged that DSA is a magnet school for arts and drama, and this court has applied the school system's description of DSA to construe the meaning of this term.

on acting and drama.[12] To the extent that Plaintiff's staffing denial claim is based on comparisons to DSA, Plaintiff does not plausibly allege racial discrimination based upon different circumstances at DSA.

### 3. Special Event Overtime

Plaintiff has alleged that white Theater Directors in the district either were not asked to perform the same volume of overtime work or were compensated with extra-duty pay. It is not plausible that the volume of overtime requests was itself due to racial discrimination. Initially, this court does not necessarily consider the number of special extracurricular events at a given school to be within Defendant's control, nor does Plaintiff so allege; rather, the number of events is more likely a factor of the number of student organizations or clubs at a specific school. There is a disparate outcome to be sure, but this court will not infer discriminatory intent where it is

---

[12] This court is not swayed by Plaintiff's assertion that DSA "is supposed to receive funding and supplements in the same manner as Defendant's other schools." (Am. Compl. (Doc. 14) ¶ 94.) This may be true, but this court finds it does not preclude the obvious inference that Defendant's choice to provide increased drama department staffing to DSA was due, at least in part, to the school's educational focus. Whether this choice was correct as a matter of budgetary allocation is not a matter for this court to decide.

unclear whether Defendant has any direct control over the outcome.

To plausibly state a claim for racial discrimination in this context, Plaintiff must allege that Defendant disproportionately held district-wide events at the Hillside theater or moved events from other schools to Hillside, and then forced Plaintiff to work overtime to staff these events. Plaintiff has alleged that white district Theater Directors were not asked to perform the same volume of overtime work, (see Am. Compl. (Doc. 14) ¶ 132), but Plaintiff has not alleged that Defendant disproportionately scheduled district-wide events at Hillside. In other words, Plaintiff has provided nothing to suggest that the disparity was due to discriminatory intent rather than a disproportionately high number of Hillside-specific events, which number was necessarily outside of Defendant's control.

This court further notes that the vast majority of special events listed in the Amended Complaint, (Am. Compl. (Doc. 14) ¶ 130), appear to be specific to Hillside (for example, the Hillside Pageant, the Coronation of Mr. and Miss Hillside, and the many concerts and ceremonies listed). By this court's count, at most five of the ninety-two listed events are district-wide events (the August 2014 District Human Resources Event, the

August 2015 District-Wide Back to School Kickoff Event, the
October 2015 Student Government Association District Event, the
November 2015 District-Wide Teaching and Learning Conference,
and the April 2016 DPS Job Fair). Plaintiff provides no
information whatsoever to guide this court in determining how
this number of district-wide events compares to other district
high schools with white Theater Directors. This court finds that
Plaintiff has failed to satisfy the second element of the
plausibility inquiry; namely, Plaintiff fails to plausibly
allege that Defendant treated nonminority comparators more
favorably than him. This court declines to blindly infer racial
discrimination, where the facts that might prove disparate
treatment are within Plaintiff's presumptive knowledge but not
alleged in the complaint.

Plaintiff additionally alleges, in the alternative, that
white district Theater Directors were paid for overtime work
while he was not. (Am. Compl. (Doc. 14) ¶ 132). Plaintiff
provides no factual support for this allegation, alleging only
"[u]pon information and belief" that such a disparity exists.
Id. Here, the absence of factual support is understandable to
this court because these facts are likely in the exclusive
control of Defendant and the white Theater Directors (in the
form of extra-duty pay contracts or pay stubs showing overtime

compensation). See Pruell v. Caritas Christi, 678 F.3d 10, 15 (1st Cir. 2012) (stating that when "some of the information needed may be in the control of defendants . . . , some latitude has to be allowed where a claim looks plausible based on what is known"). Further, while the number of extracurricular events cannot be determined by Defendant's unilateral action, the decision to pay teachers overtime compensation surely can.

This court finds that Plaintiff has plausibly alleged that Defendant discriminated against him by failing to compensate him for special event-related overtime work, while compensating white Theater Directors for similar work. Plaintiff is entitled to discovery to determine whether factual support exists for this allegation.

## V.    ADA RETALIATION CLAIM

The ADA prohibits discrimination against any individual because of that person's opposition to substantive ADA violations. 42 U.S.C. § 12203(a). "To establish a prima facie retaliation claim under the ADA, a plaintiff must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 154 (4th Cir. 2012). At the motion to dismiss stage, the

plaintiff must plausibly allege each element of the claim. See
Vega, 801 F.3d at 90.

To prove the first element of a prima facie claim, the
plaintiff must show he reasonably believed that the conduct he
opposed was a substantive ADA violation. Reynolds, 701 F.3d at
154. As to the second element, an "adverse action" is any action
that would have "dissuaded a reasonable worker from making or
supporting a charge of discrimination," even if the action was
not directly tied to employment. See Burlington N. & Santa Fe,
548 U.S. at 62, 66-68 (stating that "adverse action" as used in
the ADA retaliation context is broader than a Title VII "adverse
employment action") (quoting Washington v. Ill. Dep't of
Revenue, 420 F.3d 658, 662 (7th Cir. 2005)); see also id. at 69
(distinguishing the failure to invite an employee to lunch on a
single occasion from the repeated exclusion of an employee from
a weekly training seminar).

The plaintiff may establish a causal link, the third
element, by illustrating close temporal proximity between the
"employer's knowledge of protected activity" and the alleged
retaliatory action. Clark Cty. Sch. Dist. v. Breeden, 532 U.S.
268, 273-74 (2001). However, temporal proximity alone will not
suffice where the passage of time undermines any conclusion that
the events are causally connected. See id. (holding that a

twenty-month gap suggested "no causality at all"; citing cases finding no causal link when the gap was only three or four months). In that event, the plaintiff may also establish causation by presenting circumstantial evidence of retaliatory intent during the intervening period between the protected conduct and the adverse action. See, e.g., Lettieri v. Equant Inc., 478 F.3d 640, 650–51 (4th Cir. 2007) (intervening events showing retaliatory animus prior to actual termination provided a causal link).

This court finds that Plaintiff has plausibly alleged the first two elements of a prima facie retaliation claim — engaging in protected conduct and suffering adverse action. Plaintiff alleges, and Defendant does not appear to dispute, that Plaintiff had a good faith belief that the conduct at issue in his 2006 lawsuit constituted an ADA violation against his son, Emmanuel. (Am. Compl. (Doc. 14) ¶ 194); see also 42 U.S.C. § 12132 (prohibiting discrimination by any public entity against a disabled individual). Plaintiff's lawsuit against the Durham Public Schools was protected activity because it opposed this violation and "aided or encouraged any other individual in the exercise or enjoyment of[] any right granted" by the ADA. 42 U.S.C. § 12203(b); see also Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 701, 706 n.3 (4th Cir. 2001) (finding that

plaintiff's "request for reasonable accommodation" and subsequent threat of litigation was protected conduct). Further, this court finds that both Defendant's denial of technical staffing and alleged failure to pay overtime compensation to Plaintiff constitute adverse actions. Because these allegations meet the Title VII adverse employment action test, as described in Section IV.A above, they necessarily must meet the ADA's lower adverse action standard.[13]

Plaintiff cannot, however, establish a causal link between his 2006 lawsuit and Defendant's failure to pay overtime for his special event-related work based on timing alone. The relevant point for this inquiry is the time at which Defendant became aware of the protected activity, Plaintiff's lawsuit identifying an alleged ADA violation against his son. This awareness occurred when Plaintiff filed his initial complaint against the Durham Superintendent on May 30, 2006. See W.E.T. v. Mitchell, No. 1:06V487 (M.D.N.C. filed May 30, 2006).

---

[13] On the other hand, Plaintiff's technical supplement claim suffers from the same shortcomings here as in the discrimination analysis. See supra Section IV.A. While the employer action standard is lower for retaliation claims, such claims still require action by the employer that is adverse and would deter a reasonable worker from contesting ADA violations. See Burlington N. & Santa Fe, 548 U.S. at 68-69 (describing affirmative acts such as deliberate exclusion from a seminar).

From this court's reading of the Amended Complaint,
Plaintiff first specifically requested to the budget committee
that he be permitted to hire a Technical Director in July 2008.
(Am. Compl. (Doc. 14) ¶ 140.) Plaintiff does allege that he
advocated for technical assistance beginning in "at least 2004,"
(id. ¶ 137), but describes no specific refusals by Defendant
prior to the July 2008 event. Plaintiff first explicitly asked
for special event overtime compensation from administrators and
the school board in July 2015 and made similar requests
throughout 2015 and early 2016. (Id. ¶¶ 152–56, 160–61.)
Defendant denied these requests. (Id.) Plaintiff does not allege
any specific refusal by Defendant that is temporally closer to
the lawsuit filing date than the July 2015 event. Further, the
earliest event included in Plaintiff's list of unpaid overtime
work occurred in August 2014. (see id. ¶ 130.) Because
Defendant's specific refusals to provide technical assistance or
overtime compensation came at least two years after Plaintiff
filed his lawsuit on behalf of Emmanuel, these events are not
sufficiently proximate to provide a causal link. Breeden, 532
U.S. at 273–74.

Instead, Plaintiff must show by circumstantial evidence
that Defendant took actions clearly indicating retaliatory
intent in the period between May 2006 and July 2008. Plaintiff,

however, alleges no specific action by Defendant during this time period that suggests retaliatory animus. Further, Plaintiff states without specificity that he consistently requested technical assistance and overtime pay from Defendant starting in 2004, and that these requests were consistently denied. (Am. Compl. (Doc. 14) ¶ 137–38.) Because Defendant apparently refused Plaintiff's requests both before and after the lawsuit was filed, there appears to be no causal connection whatsoever between Defendant's actions and the lawsuit. Absent any drastic change in the tenor of Defendant's responses to Plaintiff coinciding closely with the May 2006 filing date (evidence of which is conspicuously absent from the Amended Complaint), Plaintiff's allegations do not support a plausible inference that Defendant's adverse actions were motivated by the lawsuit.

The mere fact that Assistant Superintendent Crabtree was both deposed in the lawsuit and the recipient of Plaintiff's overtime requests does not, without specific evidence of animus, make a causal connection plausible. Plaintiff must plead facts supporting an inference that Crabtree forced him to work unpaid overtime or denied him a Technical Director because of the 2006 lawsuit and associated negative publicity; for example, direct communication from Crabtree after the lawsuit was filed showing threatening or retaliatory intent. See Lettieri, 478 F.3d at

650. Plaintiff has not pled such facts. Therefore, this court finds that Plaintiff's ADA retaliation claim should be dismissed.

## VI.  <u>CONCLUSION</u>

In light of the foregoing,

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), (Doc. 18), is **GRANTED IN PART AND DENIED IN PART**, in that: (1) Defendant's motion to dismiss Plaintiff's Title VII and 42 U.S.C. § 1981 claims, as those claims relate to the alleged denial of technical staffing assistance (compared to Riverside and Jordan) and the alleged non-payment of special event-related overtime is **DENIED WITHOUT PREJUDICE**, (2) Defendant's motion to dismiss Plaintiff's Title VII and 42 U.S.C. § 1981 claims, as those claims relate to the alleged non-payment of a technical supplement and the alleged denial of technical staffing assistance (compared to DSA only) is **GRANTED**, and (3) Defendant's motion to dismiss Plaintiff's ADA retaliation claim is **GRANTED**.

**IT IS FURTHER ORDERED** that upon the filing of an Answer, this matter be set for a status conference with Magistrate Judge Joi Elizabeth Peake to schedule further deadlines in this case.

This the 19th day of February, 2019.

                        _____
                            United States District Judge