IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WENDELL TABB,                    )
                                 )
            Plaintiff,           )
                                 )
     v.                          )        1:17CV730
                                 )
BOARD OF EDUCATION OF THE        )
DURHAM PUBLIC SCHOOLS,           )
                                 )
            Defendant.           )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Before the court is the Motion for Summary Judgment filed
by Defendant Board of Education (the "Board") of the Durham
Public Schools ("DPS"). (Doc. 38.) Plaintiff Wendell Tabb, a
drama teacher in the DPS system, is suing Defendant for
disparate treatment under Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981. Plaintiff
alleges that Defendant denied him technical support staffing and
extra-duty pay based on his race. For the reasons stated herein,
the court finds Defendant's motion should be granted.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

A majority of the facts are described here, but additional
relevant facts will be addressed as necessary throughout the

opinion. The majority of facts are not disputed; any material factual disputes will be specifically addressed in the relevant analysis. The facts described in this summary are taken in a light most favorable to Plaintiff. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). As explained more fully below, <u>see infra</u> Section III.A.1.b.iii, the statute of limitations has run on any § 1981 claims that occurred and of which Plaintiff was aware prior to August 9, 2013. Therefore, the relevant time period for Plaintiff's claims is August 2013 to August 2017.

## A.  **The Parties**

Plaintiff Wendell Tabb is an African-American male and is a teacher and the Director of the Drama Department at Hillside High School ("Hillside") in Durham, North Carolina. (Verified Amended Complaint ("Am. Compl.") (Doc. 14) ¶¶ 19, 25.)[1] Plaintiff has been a drama teacher at Hillside since 1987. (<u>Id.</u> ¶ 24.) By all accounts and any measure, Plaintiff has had an incredibly successful career as a drama teacher. (<u>See, e.g.</u>, Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 40), Deposition of William Terrence Logan, III ("Logan Dep.") (Doc. 40-4) at 18,

---

[1] During the discovery period, Plaintiff verified his Amended Complaint. (Doc. 40-12.)

22[2]; Deposition of James Franklin Key, II ("Key Dep.") (Doc. 40-5) at 32; Deposition of Mary Wild Casey ("Casey Dep.") (Doc. 40-8) at 99; Deposition of Minnie Mae Forte-Brown ("Forte-Brown Dep.") (Doc. 40-9) at 24.) Plaintiff has received numerous honors and awards, to include an honorable mention during the Tony Awards. (Casey Dep. (Doc. 40-8) at 132.) The Board recently named Hillside's theater and stage after Plaintiff. (Forte-Brown Dep. (Doc. 40-9) at 36.)

Defendant Board of Education of the Durham Public Schools is a corporate entity under North Carolina law with the capacity to sue and be sued. N.C. Gen. Stat. § 115C-40. Defendant employs or employed the members of the Board, superintendents, assistant superintendents, deputy superintendents, chief officers, directors, and high school principals relevant to this action. (Am. Compl. (Doc. 14) ¶ 17.)

B. **Technical Theater Position**

Until recently, Plaintiff provided theater instruction as well as technical theater support for the drama program at Hillside High School ("Hillside"). (Logan Dep. (Doc. 40-4) at

_____

[2] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

42-43, 113.) Hillside hired a technical theater teacher on October 21, 2019. (Def.'s Mot. for Summ. J. ("Def.'s Mot.") (Doc. 38), Affidavit of Arasi Adkins ("Adkins Aff.") (Doc. 38-8) ¶ 12.) Plaintiff is pursuing this action to recover $251,328 in pay he claims he is owed for technical theater work he did during the period Defendant denied him technical support. (Doc. 40-13 at 1.)

Technical theater (or "theater tech") tasks include lighting, set construction, sound, and other various support tasks needed to produce a play. (Logan Dep. (Doc. 40-4) at 42-43.) For almost eleven years, Plaintiff has been asking Defendant to hire a technical theater teacher or assistant[3] for Hillside. (Forte-Brown Dep. (Doc. 40-9) at 85.) The Board was aware that Plaintiff wanted technical theater support. (Pl.'s Resp. (Doc. 40), Deposition of Thomas Johns Crabtree ("Crabtree Dep.") (Doc. 40-3) at 93; Forte-Brown Dep. (Doc. 40-9) at 45, 85.)

---

[3] Whereas a technical theater teacher is a certified teacher who can teach classes, a technical theater assistant is a non-certified employee who assists with technical theater tasks but cannot teach classes.

### 1. __Allotment Process__

Durham schools are allotted a certain number of teachers based on student enrollment numbers. (Crabtree Dep. (Doc. 40-3) at 45; Logan Dep. (Doc. 40-4) at 38–39; Key Dep. (Doc. 40-5) at 39.) "[B]ased on how many children you have, that's how many teachers you have." (Forte-Brown Dep. (Doc. 40-9) at 98.) "The allocation of resources to schools is determined by formula." (Pl.'s Resp. (Doc. 40), Deposition of Bertrand Paul L'Homme ("L'Homme Dep.") (Doc. 40-6) at 25.) That mathematical formula used to allocate teacher positions is the same for every high school in the district. (Logan Dep. (Doc. 40-4) at 162.)

Allotments are not broken down by subject area, but principals are required to hire enough teachers to teach the minimum state-required curriculum in English, Math, Science, and Social Studies. (Crabtree Dep. (Doc. 40-3) at 50–51; Key Dep. (Doc. 40-5) at 43, 75.) In addition to those requirements, DPS has designated some of its schools as magnet schools. (Forte-Brown Dep. (Doc. 40-9) at 25; Logan Dep. (Doc. 40-4) at 146–47.) Magnet designations are Board, not school decisions. (Key Dep. (Doc. 40-5) at 63.) In order to support a magnet program, schools must use some of their enrollment-based teacher allotments to support the magnet program. (Logan Dep. (Doc. 40-4) at 146.) Hillside has been designated as an International

-5-

Baccalaureate ("IB") magnet program. (Id.) In addition to magnet and state requirements, some schools, such as Hillside, are also required to allocate teachers to help improve academic achievement and student test scores. (Pl.'s Resp. (Doc. 40), Affidavit of Henry J. Pankey ("Pankey Aff.") (Doc. 40-10) ¶ 18; Affidavit of Hans Lassiter ("Lassiter Aff.") (Doc. 40-11) ¶ 17.)

The Board had input about the use of allotments when administrators would meet with principals to ensure they had the allotments to "support all content areas." (Logan Dep. (Doc. 40-4) at 85.) Once all a school's requirements were met, the principal had discretion to use the school's allotments as he or she saw fit. (Crabtree Dep. (Doc. 40-3) at 51.)

Principals may ask for additional teachers beyond their enrollment-based allotment. (Logan Dep. (Doc. 40-4) at 39.) The form used is a "New Position Form." (Doc. 40-31 at 1.) The form offers two ways to get a new teacher allotment: (1) re-appropriating an existing allotment, or (2) requesting a new teaching allotment beyond what student enrollment justifies. (Logan Dep. (Doc. 40-4) at 70–71; Doc. 40-31 at 1.)

The Board had to approve a new teaching position above a school's enrollment-based allotment and any new use of funds. (Logan Dep. (Doc. 40-4) at 72; L'Homme Dep. (Doc. 40-6) at 96; Forte-Brown Dep. (Doc. 40-9) at 100; Doc. 40-31 at 1.) Normally,

-6-

a request for a new teaching position would come from a school's principal, (Forte-Brown Dep. (Doc. 40-9) at 59-61), but the Superintendent himself could request a new position be created at a school, (Crabtree Dep. (Doc. 40-3) at 76; Key Dep. (Doc. 40-5) at 105-06).

### 2. Hillside from August 2013 until August 2017

Dr. Logan has been Hillside's principal since 2012. (Logan Dep. (Doc. 40-4) at 18). Dr. Logan once told Thomas Crabtree, Assistant Superintendent for Human Resources ("HR") at the time, that he would have liked to get Plaintiff a technical theater teacher but could not spare a position. (Crabtree Dep. (Doc. 40-3) at 11, 92.)

At one point during Dr. Logan's tenure as principal at Hillside, Hillside had an additional allotment to use for an arts teacher, but rather than using it to hire a theater tech, Dr. Logan used it to hire a photography teacher. (Logan Dep. (Doc. 40-4) at 100; Doc. 40-32 at 4; Casey Dep. (Doc. 40-8) at 91-94.) Dr. Logan initiated the student registration process for technical theater classes "two to three times," but "there

wasn't a demand from the students." (Logan Dep. (Doc. 40-4) at 43.)[4]

Dr. Logan had to use part of his enrollment-based allotments to support Hillside's IB magnet program. Hillside receives some additional allotments for its IB magnet program, (Doc. 40-41 at 129), but the majority of the teachers supporting the program come from the school's enrollment-based allotment, (Logan Dep. (Doc. 40-4) at 147-48). But for the magnet requirement, Dr. Logan stated he "possibly" could have supported a technical theater position at Hillside. (Id. at 148.)

Dr. Logan knew how to request an additional teacher allotment using the New Position Form. Dr. Logan was aware of the New Position Form and used it in the past but does not recall filling one out for a theater tech position. (Logan Dep. (Id. at 74.) Dr. Logan never had any additional teacher allotments approved for any subjects, even though he had at least one request a year. (Id. at 156.) Dr. Logan said the only times he got a new teacher allotment is when student enrollment at Hillside increased. (Id. at 44.)

--------

[4] There was a registration issue in 2013 when Hillside personnel failed to include Technical Theater as an offering for the next school year. (Logan Dep. (Doc. 40-4) at 103-04.)

Dr. Logan also stated that he was aware he could have converted a teaching allotment, assuming one was available, into a "classified" teaching position. (Id. at 64.) A classified position is one that can be filled by someone who does not have a teaching license. (Crabtree Dep. (Doc. 40-3) at 24.) This approach would have enabled Dr. Logan to hire a noncertified teaching assistant to help Plaintiff with technical theater work, but the individual could not teach classes. (Logan Dep. (Doc. 40-4) at 63-64.) Converting an existing classified position into a theater tech job, another option, would have required terminating another classified employee. (Crabtree Dep. (Doc. 40-3) at 167; Key Dep. (Doc. 40-5) at 55.)

### 3. Hillside Prior to Dr. Logan (Before August 2012)

Plaintiff provides affidavits from two former Hillside principals that he claims create a factual dispute about whether it was Hillside principals or the Board who made the decision not to hire a technical theater teacher. Henry Pankey was principal at Hillside starting in 2001. (Pankey Aff. (Doc. 40-10) ¶ 16.)[5] Hans Lassiter was principal at Hillside from August 2009 until February 2012. (Lassiter Aff. (Doc. 40-11) ¶ 8.)

---

[5] It is not clear from the record when Mr. Pankey's tenure at Hillside ended.

Mr. Pankey averred that his proposals to create a "Hillside School of the Arts" were repeatedly rejected by Defendant. (Pankey Aff. (Doc. 40-10) ¶¶ 31–33.) Mr. Pankey also averred that Defendant's position that principals were responsible for staffing the schools is a "false way of framing the issue." (Id. ¶ 34.) Mr. Pankey stated that "[a]s principal, my hands were tied regarding hiring new staff. Because of decisions made by the central administration, I had no discretionary funds or teaching allotments that I could use." (Id.) Mr. Pankey averred that all of his allotments "based on student population were already allocated to positions mandated by the administration and the School Board to teach the core curriculum of subjects and the specialized program (like IB) that had been placed at Hillside." (Id. ¶ 35.) Additionally, "[t]here was strong pressure to use any extra positions to enhance the reading and math skills necessary for the standardized tests." (Id.) Mr. Pankey also averred that his teaching assistant allotments were dedicated to other "mandatory positions, such as the Exceptional Children's Program . . . and the English As a Second Language Program . . . ." (Id. ¶ 36.)

Mr. Lassiter claimed the same requirements mentioned by Mr. Pankey also meant he had "little true discretion regarding allotments." (Lassiter Aff. (Doc. 40-11) ¶ 17.) Mr. Lassiter

-10-

averred it was "untrue" that principals at Hillside decided not to use their allotments to hire a theater tech. (Id. ¶ 16.) Mr. Lassiter claims Defendant "required the use of [Hillside's] allotments for these other purposes," like supporting the IB magnet program and teaching remedial classes. (Id. ¶ 17.)

As will be explained hereafter, whether Defendant or the individual principal has ultimate control of teaching positions or hiring a technical director is not a material fact necessary to resolution of Defendant's motion for summary judgment.

### 4. Theater Techs at Other Schools

Plaintiff relies upon comparison to other schools to prove that he, as an African-American theater director, was treated differently from similarly-situated Caucasian theater directors. There were other schools in the district with technical theater teachers. Those schools who had technical theater positions used a "regular teacher allotment to support a technical theatre art teacher[]"; "[n]o school in the district has received a specific allotment for a technical theatre arts teacher." (Logan Dep. (Doc. 40-4) at 92; Doc. 40-31 at 18.)[6]

---

[6] The email quoted is from Dr. Eric Becoats, a former superintendent and African-American male. (Crabtree Dep. (Doc. 40-3) at 33.)

Plaintiff argues that three schools are valid comparators: Riverside, Jordan, and Durham School of the Arts ("DSA"). (Pl.'s Resp. (Doc. 40) at 15-21.) For reasons explained hereafter, the court continues to find that DSA is not a valid comparator. See infra note 21. Therefore, two schools in the district are valid comparators in this case: Riverside High School ("Riverside") and Jordan High School ("Jordan"). During Mr. Key's tenure as Area Superintendent from 2011 to 2014, Riverside and Jordan were the largest high schools in the district. (Key Dep. (Doc. 40-5) at 13, 87.) Riverside, in particular, had roughly 1,850 to 2,000 students each year during that time. (Id. at 87.) During the same period, Hillside varied from between 1,200 and 1,300. (Id. at 86.) In the 2014-15 school year, Jordan had 1,854 students. (Doc. 40-41 at 175.)

### a. Riverside High School

Mr. Key was principal at Riverside from 2004 to 2010. (Key Dep. (Doc. 40-5) at 76.) Mr. Key was able to hire a technical theater teacher by using his enrollment-based allotment; Riverside was large enough to have allotments supporting two visual arts teachers, and Mr. Key decided to use one of the positions to allow for an extra drama teacher in light of student demand. (Key Dep. (Doc. 40-5) at 74, 85, 92; Doc. 40-38 at 11.) While Mr. Key was principal at Riverside, there were

-12-

roughly seventy-five students per semester in Riverside's technical theater classes. (Key Dep. (Doc. 40-5) at 199.) Mr. Key wanted a technical theater class because Riverside did not have a "shop" class providing students with hands-on technical or mechanical training. (Id. at 200.) Also, Riverside needed an extra art elective but did not have physical space for another class, so they converted part of the theater wing into a theater tech shop. (Casey Dep. (Doc. 40-8) at 34.)

Riverside has had several teachers come through its drama department both before and after Mr. Key's time. Kee Strong, a Caucasian female, was a theater teacher at Riverside from July 1, 2002, until she retired on June 30, 2015. (Doc. 42 at 17; Key Dep. (Doc. 40-5) at 77; Crabtree Dep. (Doc. 40-3) at 128.) While she was at Riverside, Ms. Strong had several theater techs who worked with her. (Crabtree Dep. (Doc. 40-3) at 131.) Wesley Schultz was a theater teacher who taught at Riverside from January 26, 2011, until summer of 2012. (Id. at 133.). Michael Krauss worked as a theater tech teacher from summer of 2011 until June 12, 2012. (Casey Dep. (Doc. 40-8) at 33; Doc. 42-8 at 1.) After Wesley Schultz and Michael Krauss left Riverside in summer of 2012, Monique Taylor was hired. (Casey Dep. (Doc. 40-8) at 34.)

-13-

Monique Taylor was hired as a technical theater teacher for Riverside on August 20, 2012. (Crabtree Dep. (Doc. 40-3) at 155.) Ms. Taylor is African-American. (Id.)

After Ms. Taylor was hired, Glenn Fox worked as a technical theater teacher at Riverside from August 20, 2012, through June 14, 2013. (Doc. 40-43 at 125.) Andrew Way was then hired to work as a technical theater teacher from September 5, 2013, until June 12, 2015. (Id.; Adkins Aff. (Doc. 38-8) ¶ 7.)

After Ms. Strong's retirement in June 2015, Tom Nevels then worked at Riverside as a theater teacher at Riverside for a short time in fall of 2015. (Casey Dep. (Doc. 40-8) at 35.)[7]

After Mr. Nevels left in November 2015, Monique Taylor was the only theater teacher at Riverside. In 2016, Riverside created two "classified" employee positions by converting a teacher allotment. (Crabtree Dep. (Doc. 40-3) at 159; Key Dep. (Doc. 40-5) at 73; Deposition of William Lawayne Holley, Jr. ("Holley Dep.") (Doc. 40-7) at 45; Adkins Aff. (Doc. 38-8) ¶ 9.) Using one of those classified positions, William Holley was hired to work as a theater tech at Riverside on January 4, 2016

---

[7] As Mr. Crabtree acknowledged during his deposition, there are inconsistencies in Mr. Nevels's file about how long Mr. Nevels was at Riverside. (Crabtree Dep. (Doc. 40-3) at 149–50.) Mr. Crabtree believed Mr. Nevels was at Riverside from August 17, 2015 until November 20, 2015. (Id. at 149.)

-14-

– Mr. Holley still works at Riverside. (Crabtree Dep. (Doc. 40-3) at 135–36.) When Mr. Holley was hired as a classified employee, Monique Taylor was the only other employee in the Riverside theater department. (Holley Dep. (Doc. 40-7) at 76; Casey Dep. (Doc. 40-8) at 34–38.) Mr. Holley had been working at Riverside as early as 2008 as an external contractor. (Holley Dep. (Doc. 40-7) at 29.)

### b.  Jordan High School

Olivia Bellido is the theater teacher at Jordan High School. (Crabtree Dep. (Doc. 40-3) at 156.) Ms. Bellido is Caucasian. (Id. at 157.) Ms. Bellido was hired to teach theater and technical theater and has been teaching both since 2011. (Def.'s Reply Brief ("Def.'s Reply") (Doc. 43), Affidavit of Olivia Bellido ("Bellido Aff.") (Doc. 43-1) ¶ 2; Adkins Aff. (Doc. 38-8) ¶ 3.) Ms. Bellido is the only theater instructor at Jordan and has been since 2011. (Bellido Aff. (Doc. 43-1) ¶ 3.) Ms. Bellido has asked her principals, as well as past and present DPS Directors of Arts Education, to hire a technical theater teacher "as early as 2011," but her requests have all been denied. (Bellido Aff. (Doc. 43-1) ¶¶ 7–8.) Ms. Bellido has been told by her principals that Jordan does not have the teacher allotments to support a technical theater teacher. (Bellido Aff. (Doc. 43-1) ¶ 8.) A previous drama teacher at

-15-

Jordan, Hope Hynes, a Caucasian female, left DPS to teach in another district because she did not get the theater tech teacher she wanted. (Casey Dep. (Doc. 40-8) at 30, 32.)

### C. Extra-Duty Pay

Defendant would regularly use Hillside Theater for district-wide events. (Casey Dep. (Doc. 40-8) at 116.) Hillside was a preferable location because they had good parking and a good auditorium. (L'Homme Dep. (Doc. 40-6) at 131.)

Plaintiff would often be present in Hillside Theater when it was being used for district-wide events in order provide technical support. (Pl.'s Resp. (Doc. 40), Deposition of Plaintiff Wendell Tabb ("Tabb Dep.") (Doc. 40-2) at 33.) Plaintiff stated he generally "was not getting paid for the district events and they've only paid me for a very slim few." (Id. at 27.) Plaintiff has always been paid for outside theater rentals ("facility rentals"), which are rentals made by groups outside DPS. (Id. at 27–28.)

Plaintiff asked Board officials for compensation for "all of the events" for which he had not been compensated. (Id. at 38.) In his Verified Amended Complaint, Plaintiff alleges that, "[d]espite repeated requests, he has not been paid for this work." (Am. Compl. (Doc. 14) ¶ 130.)

Plaintiff's Verified Amended Complaint also includes a long list of district-wide events he claims to have not received extra-duty pay for working. (Id.) However, Plaintiff did receive extra-duty contracts for two of the events on that list. Plaintiff received an extra-duty contract for the 2015 Summer School graduation and was paid for that event. (Tabb Dep. (Doc. 40-2) at 60, 111; Doc. 40-15 at 26–28.) Plaintiff also received an extra-duty contract for a May 2015 DPS Career and Technical Education ("CTE")[8] event, (Tabb Dep. (Doc. 40-2) at 113; Doc. 40-15 at 29–31), but Plaintiff does not recall if he was actually paid for that event, (Tabb Dep. (Doc. 40-2) at 113). Dr. Logan cannot confirm or deny that Plaintiff worked all the events in paragraph 130 of his Verified Amended Complaint. (Logan Dep. (Doc. 40-4) at 114.) Plaintiff admits he did receive extra-duty contracts prior to filing his Complaint. (Tabb Dep. (Doc. 40-2) at 103–04.)

Plaintiff, in pointing to comparators for his extra-duty claim, named William Holley as a Caucasian employee who was receiving extra-duty pay when Plaintiff was not. (Id. at 71.) Specifically, Plaintiff noted that Mr. Holley was compensated

---

[8] CTE is the modern nomenclature for vocational instruction. (Crabtree Dep. (Doc. 40-3) at 58.)

for his yearly work at DPS's Evening of Entertainment Event. (Id. at 72.) Plaintiff also claimed Bill Thomason, an IT employee, received extra-duty pay for district-wide events. (Tabb Dep. (Doc. 40-2) at 74.) Plaintiff did not name a specific district event Mr. Thomason worked for which he received extra-duty pay. (Tabb Dep. (Doc. 40-2) at 70-74.)

Mr. Holley's sound and light companies were used by DPS for roughly ten years to support district-wide events. (Holley Dep. (Doc. 40-7) at 42, 51-52.) This was before Mr. Holley was hired as a classified employee at Riverside in January 2016. (Id.) Mr. Holley's first company to receive contracts was Holley Johnson Sound, Lighting and Production Company, Inc. (Doc. 40-43 at 105.) That company was administratively dissolved, and Mr. Holley later founded Ferret Sound Company, LLC ("Ferret Sound"). (Doc. 40-43 at 110, 112.) Ferret Sound continued to perform contracts for DPS after Mr. Holley was hired at Riverside. (Holley Dep. (Doc. 40-7) at 51; Casey Dep. (Doc. 40-8) at 38-39.)

Mr. Holley received extra-duty contracts for work he did as a Riverside employee outside normal hours. (Doc. 40-16 at 115-19.) Mr. Holley's earliest extra-duty contract in the record is for work done between June 1-3, 2017. (Id. at 119.) Only one of Mr. Holley's extra-duty contracts is for a district-wide

-18-

event. (Id. at 117.) Though Mr. Holley has never been denied extra-duty pay when he asked for it, he has worked district events without pay. (Holley Dep. (Doc. 40-7) at 77.) Mr. Holley said he is sometimes there "voluntarily" to support the events. (Id. at 78.)

Ms. Bellido, a Caucasian female and Jordan's only drama teacher, averred that she is "present in Jordan's theater for all school and district-wide events, including during nights and on weekends," and she does "not receive extra-duty pay for any of these events." (Bellido Aff. (Doc. 43-1) ¶ 11.)

### D.  **Procedural History**

Plaintiff originally filed suit in this court on August 9, 2017, alleging causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Americans with Disabilities Act (the "ADA"). (Doc. 1 at 1.) Plaintiff's original Complaint alleged that Defendant discriminated against him in giving other schools technical theater support, in failing to pay Plaintiff for his additional work in light of his lack of technical theater support, in failing to pay him extra-duty pay for working district-wide events held at Hillside, and in retaliating against Plaintiff under the ADA. (Doc. 1 at 26-28.)

-19-

After Defendant filed its first Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), (Doc. 12), Plaintiff filed an Amended Complaint, (Doc. 14). Defendant filed a second Motion to Dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. 18.) The court granted in part and denied in part Defendant's second Motion to Dismiss. (Doc. 25.) Specifically, the court held:

> (1) Defendant's motion to dismiss Plaintiff's Title VII and 42 U.S.C. § 1981 claims, as those claims relate to the alleged denial of technical staffing assistance (compared to Riverside and Jordan) and the alleged non-payment of special event-related overtime is DENIED WITHOUT PREJUDICE, (2) Defendant's motion to dismiss Plaintiff's Title VII and 42 U.S.C. § 1981 claims, as those claims relate to the alleged non-payment of a technical supplement and the alleged denial of technical staffing assistance (compared to DSA only) is GRANTED, and (3) Defendant's motion to dismiss Plaintiff's ADA retaliation claim is GRANTED.

Tabb v. Bd. of Educ. of Durham Pub. Sch., No. 1:17CV730, 2019 WL 688655, at *13 (M.D.N.C. Feb. 19, 2019).

Following discovery, Defendant submitted a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(a). (Doc. 38.) Defendant filed a supporting brief, (Doc. 39); Plaintiff responded, (Doc. 40); and Defendant replied, (Doc. 43). Defendant's Motion for Summary Judgment is now ripe for ruling.

-20-

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir. 2003) (citing Matsushita Elec., 475 U.S. at 586-87). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented." McLean, 332 F.3d at 719 (citing Liberty Lobby, 477 U.S. at 247-48).

When considering a motion for summary judgment, courts must "construe the evidence in the light most favorable to . . . the non-moving party. [Courts] do not weigh the evidence or make

-21-

credibility determinations." <u>Wilson v. Prince George's Cnty.</u>,
893 F.3d 213, 218-19 (4th Cir. 2018).

**III.** <u>**ANALYSIS**</u>

Title VII and 42 U.S.C. § 1981 each prohibit employment
discrimination on the basis of race. 42 U.S.C. § 2000e-2(a)(1);
42 U.S.C. § 1981. A race-based employment discrimination claim
must assert that the plaintiff "belongs to a racial minority"
and was either not hired, fired or suffered some adverse
employment action due to his race. <u>McDonnell Douglas Corp. v.
Green</u>, 411 U.S. 792, 802 (1973). The legal standard for Title
VII and Section 1981 claims is the same. <u>Thompson v. Potomac
Elec. Power Co.</u>, 312 F.3d 645, 649 n.1 (4th Cir. 2002).

"To establish a prima facie case of [racial]
discrimination, a plaintiff must show: '(1) membership in a
protected class; (2) satisfactory job performance; (3) adverse
employment action; and (4) that similarly-situated employees
outside the protected class received more favorable treatment."
<u>Gerner v. Cnty. of Chesterfield</u>, 674 F.3d 264, 266 (4th Cir.
2012) (quoting <u>White v. BFI Waste Servs., LLC</u>, 375 F.3d 288, 295
(4th Cir. 2004)); <u>Coleman v. Md. Court of Appeals</u>, 626 F.3d 187,
190 (4th Cir. 2010).

"At the summary judgment stage, the plaintiff carries the
initial burden of establishing the <u>prima facie</u> elements of his

-22-

claims under Title VII upon challenge by an adverse party. This burden is met by utilizing either direct or circumstantial evidence." Reid v. Dalco Nonwovens, LLC, 154 F. Supp. 3d 273, 284 (W.D.N.C. 2016); accord Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005); Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993), holding modified by Stokes v. Westinghouse Savannah River Co., 206 F.3d 420 (4th Cir. 2000).

> If the plaintiff succeeds in proving a prima facie case, the burden of going forward shifts to the employer, who must articulate a non-discriminatory reason for the difference in disciplinary enforcement. Should the employer articulate such a non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the employer's reasons are not true but instead serve as a pretext for discrimination. The plaintiff, however, always bears the ultimate burden of proving that the employer intentionally discriminated against him.

Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993); accord Engler v. Harris Corp., 628 F. App'x 165, 167 (4th Cir. 2015).

Plaintiff offers no direct evidence of discrimination — Plaintiff is proceeding under the McDonnell Douglas framework by offering indirect evidence of discrimination. There is no genuine dispute of material fact that Plaintiff is a member of a protected class and was performing his job satisfactorily. Plaintiff, as an African-American, is a member of a protected

-23-

class under Title VII and § 1981. Defendant does not contest that Plaintiff has exceeded expectations in the performance of his job. (See generally Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Br.") (Doc. 39); Def.'s Reply (Doc. 43).) Indeed, the record is replete with evidence of Plaintiff's stellar performance as a drama teacher.

The court, therefore, will only analyze Plaintiff's claims to determine if there is a genuine dispute of material fact as to whether Plaintiff experienced an adverse employment action and, if so, whether that action occurred under circumstances that give rise to an inference of racial discrimination. Plaintiff alleges two adverse employment actions: discriminatory technical theater staffing and failure to pay extra-duty pay. The court addresses each in turn.

### A.   Discriminatory Staffing Claim

Plaintiff alleges that Defendant denied him technical theater staffing because of his race. (Am. Compl. (Doc. 14) ¶¶ 41-45.)

Defendant moves for summary judgment largely on two grounds. First, Defendant argues that the undisputed evidence shows that the decision to hire or not hire theater techs at other schools was made by principals at those schools, not by the Board. Defendant argues it did not provide a specific

-24-

theater tech allotment to any school. Therefore, Defendant argues, there is no genuine dispute that Defendant did not take an adverse employment action. Second, Defendant argues that Plaintiff can point to no evidence of a Caucasian comparator during the limitations period who received the benefit that Plaintiff sought. Therefore, Defendant argues, Plaintiff cannot make out a prima facie case of discrimination

Plaintiff argues that summary judgment is inappropriate here because there is a genuine dispute of material fact as to whether it was Defendant or Hillside principals who were responsible for "the failure to hire a Theatre tech." (Pl.'s Resp. (Doc. 40) at 7.) Plaintiff argues that Defendant, specifically the Superintendent, had the authority to create a new position for a theater tech at Hillside by either giving an additional allotment to the school or hiring a classified employee but chose not to do so. (Id. at 13–14.) Plaintiff argues this creates a genuine dispute as to whether it was Hillside principals or the Board denying Plaintiff the staffing he requested.

Plaintiff also argues that Defendant made it impossible for Hillside principals to hire a theater tech because of the magnet and academic achievement requirements they placed on Hillside principals. (Id. at 9.) Because of these requirements, Plaintiff

-25-

argues, Hillside principals had no real discretion in how they used their enrollment-based teacher allotments. (Id. at 7, 9.) Therefore, Plaintiff argues, there is a factual dispute about whether Hillside principals were the real decision makers.

As for comparators during the limitations period, Plaintiff points to Riverside and DSA[9] as examples of Caucasian theater teachers being provided theater techs. Plaintiff argues that Jordan is not a valid comparator, because Ms. Bellido, the Caucasian theater director at Jordan, has not requested a theater tech and she herself is a "theater tech." (Id. at 17-18.) Plaintiff then points to the string of theater techs provided to Riverside High School as evidence of a pattern of providing the technical staffing to Caucasian teachers but denying it to Plaintiff. (Id. at 16–17.) Plaintiff argues that, until 2015, Riverside's drama program was "run" by Kee Strong, a Caucasian female, and that the theater support hired was hired to support her. (Id. at 15-16.)

### 1. Adverse Employment Action

The court begins by analyzing whether there is a genuine dispute of material fact that Defendant's actions in or

---

[9] For reasons explained below, infra note 21, the court continues to find that DSA is not a valid comparator.

effecting the failure to hire a theater tech are an adverse
employment action.

a. <u>**Theater Tech is not "Part and Parcel"**</u>

This court found, in its order denying Defendant's 12(b)(6)
motion, that <u>Hishon</u> and the factual allegations plausibly stated
a claim. <u>See</u> <u>Tabb</u>, 2019 WL 688655, at *7; <u>Hishon v. King &
Spalding</u>, 467 U.S. 69, 75 (1984). However, at this stage of the
proceedings, considering the facts in the light most favorable
to Plaintiff, Plaintiff has not come forward with evidence to
support a claim based on <u>Hishon</u> that Defendant took an adverse
employment action as to technical staffing. In its previous
order allowing Plaintiff's discriminatory staffing claim to
proceed, this court stated the following: "Here, Defendant was
under no obligation to provide technical staffing assistance to
any district theater departments. However, once an employer
offers a benefit to certain employees, it assumes the obligation
to do so in a non-discriminatory manner." <u>Tabb</u>, 2019 WL 688655,
at *7.

Following the development of the record during discovery,
it does not appear the facts support a finding that a theater
tech is "part and parcel" of employment as a high school drama
teacher within DPS. <u>See</u> <u>Hishon</u>, 467 U.S. at 75 ("A benefit that
is part and parcel of the employment relationship may not be

-27-

doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all."). The Hishon Court explained that those "benefits that comprise the 'incidents of employment,' or that form 'an aspect of the relationship between the employer and employees,' may not be afforded in a manner contrary to Title VII." Id. at 75–76 (quoting Allied Chem. & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 178 (1971)). Hishon itself dealt with a law firm's implicit promise to consider an attorney for partnership, a significant incident of employment for any new lawyer. In a later Supreme Court case, the Court cited to Hishon when discussing paid versus unpaid leave, Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 71 (1986); another discussed continued employment beyond a mandatory retirement age, see Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 114–16 (1985). The Fourth Circuit's only case to fully address Hishon's "part and parcel" analysis dealt with severance benefits. Gerner, 674 F.3d at 267. The Gerner court cited other cases that dealt with severance benefits and supervisory opportunities necessary to advancement. See id.

The factual background of those and other cases suggests Hishon only applies to objective employment benefits that inure

-28-

directly to the employee and are also so fundamental as to be considered "part and parcel" of the employment relationship. The record indicates that providing a technical theater teacher or theater tech is not an objective benefit that inures directly to a theater teacher in the DPS.[10]

Regardless of whether the benefit inures to theater teachers directly, the record indicates that a theater tech is not a "part and parcel" benefit for theater teachers in DPS. At the time Plaintiff filed his Charge, only two out of six DPS high schools had theater techs. (See, e.g., Doc. 40-34 at 22; Pl.'s Resp. (Doc. 40) at 15-19.) That indicates that theater tech staffing is not "part and parcel" of employment as a high school drama teacher in DPS as the majority of schools described do not have a theater tech. Plaintiff's claim fails to allege an adverse employment action on that fundamental point.

---

[10] Although not argued by the parties, this court would find alternatively that the failure to hire a theater tech is not an adverse action with respect to Plaintiff's employment. Generally speaking, teachers and curriculum are designed for the benefit of the students, not other faculty. Plaintiff's desire for a theater tech to improve the quality of the theater, as well as Plaintiff's willingness to perform the additional technical work when possible, are all commendable. Nevertheless, the allocation of resources, including the hiring of teachers, are matters intended to benefit the students. Regardless, the parties have not raised this issue, and the court finds that a theater tech is not part of the employment relationship.

## b.  <u>**No Adverse Action and No Pretext**</u>

Even if a theater tech is part and parcel of employment as a drama teacher in DPS, Plaintiff's claim fails for other reasons. Plaintiff's argument that Defendant took an adverse employment action is two-pronged.

First, Plaintiff argues that Defendant took an adverse employment action in denying Plaintiff and Hillside principals' requests to provide an additional allotment or funds, beyond the school's enrollment-based allotment or normal funds, which they could use to hire a technical theater teacher. The second argument is that Defendant took an adverse employment action in preventing Hillside principals from using their enrollment-based allotments to hire a theater tech.

As to the first, there is no genuine dispute of material fact that Defendant never provided an additional allotment to any other school. Therefore, Defendant did not deny that benefit in a discriminatory way, because it did not provide it to anyone else. As to the second, that Defendant's requirements prevented Hillside principals from using their enrollment-based allotments to a hire a theater tech, the court finds that, when viewing the record in a light most favorable to Plaintiff, he has come forward with evidence supporting a prima facie case of discrimination. However, Plaintiff has failed to come forward

-30-

with evidence upon which a reasonable jury could rely in determining that Defendant's magnet program and academic achievement requirements were pretext for preventing Hillside from hiring a theater tech due to Plaintiff's race.

<b>i. <u>No Additional Allotment for Other Schools</u></b>

There is no genuine dispute of material fact that Defendant never provided an additional theater tech allotment to another school. Therefore, Defendant did not discriminate against Plaintiff when it denied his requests for an additional allotment.

Once an employer offers a benefit to certain employees, it assumes the obligation to offer it to other employees in a non-discriminatory manner.[11] <u>Hishon</u>, 467 U.S. at 75. As the Fourth Circuit noted, "courts have consistently recognized that the discriminatory denial of a <u>non-contractual</u> employment benefit constitutes an adverse employment action." <u>Gerner</u>, 674 F.3d at 267.

There is a fundamental difference between the <u>Hishon</u> line of cases and how theater techs were hired at other schools in DPS. The cases cited by the <u>Gerner</u> Court all involved situations

_____

[11] Again, assuming the benefit is, in fact, "part and parcel."

where an employer obviously provided a benefit to some
employees, but then withheld it from others in a discriminatory
fashion. See Trans World Airlines, 469 U.S. at 120–21 (airline's
discriminatory policy of allowing some pilots to "bump" less-
senior flight engineers, but not allowing others because of
their age); Paquin v. Fed. Nat'l Mortg. Ass'n, 119 F.3d 23, 32
(D.C. Cir. 1997) (employer offered a noncontractual severance
package, but then withdrew it); DiBiase v. SmithKline Beecham
Corp., 48 F.3d 719, 722–23, 25 (3d Cir. 1995) (noncontractual
severance benefit was offered in discriminatory fashion); Judie
v. Hamilton, 872 F.2d 919, 921–22 (9th Cir. 1989) (employer
permitted Caucasian employees to engage in noncontractually
required supervisory responsibilities, but denied same
opportunity to minority employee).[12] Gerner itself dealt with a
situation where an employer offered a less favorable severance
package to a female employee than it offered to its male
employees. Gerner, 674 F.3d at 265.

By contrast to those cases, there is no genuine dispute
that Defendant did not provide an additional allotment or

_____

[12] Another case cited by the Gerner Court, Cunico v. Pueblo
School District No. 60, 917 F.2d 431 (10th Cir. 1990), cited
Hishon to support the proposition that employers can avoid
discriminating against employees by either giving every employee
the same benefit, or providing no benefit at all. See Cunico,
917 F.2d at 442.

-32-

additional funding to any school for the purpose of hiring a theater tech. (Logan Dep. (Doc. 40-4) at 92; Doc. 40-31 at 18; Def.'s Mot. (Doc. 38), Affidavit of Alexander Modestou ("Modestou Aff.") (Doc. 38-9) ¶ 17.) Dr. Eric Becoats, the DPS superintendent before Dr. L'Homme, and an African-American male, was straightforward when he wrote to Plaintiff saying, "[n]o school in the district has received a specific allotment for a Technical Theatre Arts Teacher. Both DSA and Riverside utilize a regular teacher allotment to support a Technical Theatre Art Teacher." (Doc. 40-31 at 18.)[13]

DPS high schools are given unassigned teacher allotments based on the school's enrollment. (Crabtree Dep. (Doc. 40-3) at 45; Logan Dep. (Doc. 40-4) at 38-39; Key Dep. (Doc. 40-5) at 38-39; Modestou Aff. (Doc. 38-9) ¶¶ 12-13.) The mathematical formula used to allocate teacher positions is the same for every high school in the district. (Logan Dep. (Doc. 40-4) at 162;

_____

[13] Plaintiff claims it will be for the jury to decide if Dr. Becoats or Mr. Lassiter is telling the truth about whether Defendant or principals denied Plaintiff's request, but even if a conflict exists, it is not material. Mr. Lassiter's account, however, does not contradict this statement. It seems Mr. Lassiter asked Dr. Becoats for an additional allotment to support a theater tech. (See Lassiter Aff. (Doc. 40-11) ¶¶ 18-19.) If he was in fact asking for an additional allotment, there is no dispute that Dr. Becoats denied it. Even so, he was denying Plaintiff something that nobody else in the district received: an additional allotment for a theater tech position. No jury is needed to resolve this fact.

Doc. 40-42 at 84 (state allocation formula).) Each school's principal then uses those allotments to hire enough teachers to meet state and local curriculum requirements. (Crabtree Dep. (Doc. 40-3) at 50–51.) Despite Plaintiff's argument to the contrary, Plaintiff offers no evidence to support the claim that schools were provided additional "discretionary" allotments. (Pl.'s Resp. (Doc. 40) at 9.) There is no genuine dispute that Defendant did not provide any other school a technical theater teaching allotment.

The way in which comparator schools hired or did not hire theater techs demonstrates this point.[14] There is no genuine dispute that Riverside used its enrollment-based teacher allotment to hire its theater tech staff. (Key Dep. (Doc. 40-5) at 85, 92, 199–200; Doc. 40-38 at 11.) Even Mr. Holley was hired using an enrollment-based allotment after it created a "classified" employee position by converting a teacher allotment. (Crabtree Dep. (Doc. 40-3) at 160; Key Dep. (Doc. 40-5) at 73; Holley Dep. (Doc. 40-7) at 42.) There is no genuine

---

[14] Plaintiff has come forward with no evidence that other principals were acting at Defendant's direction when they hired or did not hire theater techs. Indeed, Mr. Key's undisputed testimony indicates that he chose to use an allotment to hire a theater tech for reasons specific to Riverside, such as the other arts courses it offered and the physical space available.

dispute that Jordan has not had a theater tech since 2011, before the limitations period, because Jordan's principals do not have an enrollment-based allotment to spare. (Bellido Aff. (Doc. 43-1) ¶ 7.) Indeed, a previous drama teacher at Jordan, Hope Hynes, a Caucasian female, left DPS to teach in another district because she did not get the theater tech teacher she requested. (Casey Dep. (Doc. 40-8) at 30, 32.)

Plaintiff is correct that Defendant could have provided a new allotment from local funds, (Logan Dep. (Doc. 40-4) at 39; Crabtree Dep. (Doc. 40-3) at 76; Key Dep. (Doc. 40-5) at 105-06; L'Homme Dep. (Doc. 40-6) at 90-91, 94; Doc. 40-31 at 1), or it could have provided local funds to create a new classified position, (Crabtree Dep. (Doc. 40-3) at 159). In fact, in the past, Defendant has approved additional allotments for Hillside to support the IB magnet program as well as additional teaching positions to boost test scores. (L'Homme Dep. (Doc. 40-6) at 90-91.) There is no genuine dispute as to whether Defendant could give Plaintiff the theater tech support he requested in

the form of an additional allotment.[15] But again, as the cases relied upon by the Gerner Court demonstrate, employers are only under an obligation to equitably provide non-contractual benefits that the employer has provided to others.

Mr. Pankey and Lassiter's efforts to get a theater tech for Plaintiff beyond Hillside's enrollment-based allotment also do not create a genuine dispute of material fact on this point. Mr. Pankey's efforts to get Plaintiff a theater tech were wrapped up in his proposal to create a "Hillside School of the Arts." (Pankey Aff. (Doc. 40-10) ¶¶ 26-27, 32-33.) Such a request required more from Defendant than just hiring an additional teacher. (See id.) Defendant's decision to reject the creation of a second school of the arts does not support the

_____

[15] Even though Defendant could give the position, Dr. Logan stated he never had <u>any</u> additional allotments approved, though he did have at least one request per year from people other than Plaintiff. (Logan Dep. (Doc. 40-4) at 44, 155-56.) This fact further undermines Plaintiff's claim that the Board's failure to provide an additional allotment had anything to do with him or his race.

Dr. Logan also stated that he was told any request for an allocation above Hillside's enrollment-based allotment would be denied since Hillside was over allotted, (<u>id.</u> at 77); the record separately supports that account. In 2017, Hillside had the lowest student-to-teacher ratio in the DPS by almost four students per teacher. (Crabtree Dep. (Doc. 40-3) at 161; Key Dep. (Doc. 40-5) at 206-08.) In fact, when Dr. Logan first started at Hillside, he had too many teachers left over from the School Improvement Grant ("SIG") allotments given to Hillside for academic improvement. (Logan Dep. (Doc. 40-4) at 143.)

-36-

conclusion that Defendant was discriminating against Plaintiff. Mr. Lassiter also advocated for such an academy at Hillside by using funds from a Federal Student Improvement Grant, but "core area subjects outlasted needs in PE, world languages, and as we're now seeing, CTE." (Key Dep. (Doc. 40-5) at 157; Doc. 40-39 at 11.) Plaintiff has produced no evidence that another school received SIG funds to hire a theater tech.

There is no genuine dispute of material fact that Defendant never provided a theater tech allotment to any school, nor did Defendant ever approve an additional allotment for a school that it could convert to a classified position, nor has Plaintiff produced evidence that Defendant provided discretionary funds for a school to use to hire theater tech support that he did not receive. Plaintiff, therefore, has not provided any evidence that Defendant provided the benefit of a theater tech allotment to one drama teacher that was correspondingly denied to Plaintiff. To the extent that Plaintiff's disparate staffing claim rests on Defendant's refusal to provide Plaintiff an allotment above Hillside's enrollment-based allotment, there is no genuine dispute of material fact that Defendant did not take adverse employment action against Plaintiff. See Hishon, 467 U.S. at 75.

ii. **Plaintiff has not come forward with Evidence that Defendant's Requirements for Hillside were Pretext for Discriminating Against Plaintiff**

Plaintiff also argues that Defendant took an adverse employment action in the way it prevented Hillside principals from using their enrollment-based allotments to hire a theater tech for Plaintiff. (Pl.'s Resp. (Doc. 40) at 9.) Plaintiff does not contest that Hillside principals were responsible for hiring teachers, and there is no genuine dispute as to that fact.[16] Instead, Plaintiff claims Defendant's magnet program and academic achievement priorities meant Hillside principals had to hire teachers that supported Defendant's goals, meaning Hillside did not have the "discretionary allotments" to hire a theater tech for Plaintiff. (Id.)

Viewing the record in light most favorable to Plaintiff, the court will assume without deciding that Plaintiff has come

_____

[16] Even Mr. Pankey and Mr. Lassiter implicitly concede that fact. Mr. Pankey said that Defendant's priorities meant his "hands were tied," since he had to hire teachers to meet Defendant's expectations. (Pankey Aff. (Doc. 40-10) ¶ 34.) Mr. Pankey did not aver that Defendant told him who to hire or how to meet those requirements. Likewise, Mr. Lassiter said he had "little true discretion" about what kinds of teachers to hire since he, too, had to support the IB magnet program and other academic priorities. (Lassiter Aff. (Doc. 40-11) ¶ 17.) Mr. Lassiter did not say he did not make hiring decisions, only that he had to do so within the parameters set by Defendant.
(Footnote continued)

-38-

forward with evidence supporting his prima facie case, to
include an adverse employment action, on the theory that
Defendant's requirements limited Hillside's discretion on how to
use its enrollment-based allotments.[17] However, Plaintiff

---

Dr. Logan described in detail the process for hiring a new
teacher, a process that starts with a principal identifying a
need, posting a position, and interviewing candidates, and
picking the candidate to hire. (Crabtree Dep. (Doc. 40-3) at
26-27; Logan Dep. (Doc. 40-4) at 43.)

[17] The undisputed record evidence is that Dr. Logan, the
only Hillside principal during the relevant period, exercised
his discretion at least once in choosing to hire a photography
teacher over a theater tech. (Logan Dep. (Doc. 40-4) at 100;
Doc. 40-32 at 4; Casey Dep. (Doc. 40-8) at 91-94.) Dr. Logan
made that decision because there was a higher student demand for
photography than there was for technical theater. (Casey Dep.
(Doc. 40-8) at 93.) Dr. Logan also stated that he initiated the
student registration process for technical theater classes "two
to three times," but "there wasn't a demand from the students."
(Logan Dep. (Doc. 40-4) at 43.) In 2019, Dr. Logan was given a
list of 37 students who were interested in taking technical
theater; as he stated, that number of students justifies a
technical theater class, but not hiring a new fulltime technical
theater teacher. (Id. at 123-24.)
    Despite this evidence, Plaintiff has come forward with
other evidence upon which a reasonable jury could rely in
reaching the conclusion that Defendant prevented Hillside
principals from using their enrollment-based allotments to hire
a theater tech. (See Pankey Aff. (Doc. 40-10) ¶ 34; Lassiter
Aff. (Doc. 40-11) ¶¶ 16-20.) Dr. Logan also stated he wanted to
hire a technical theater teacher but could not spare a teacher
allotment. (Crabtree Dep. (Doc. 40-3) at 92.) The Board and
administrators were in agreement that Dr. Logan would have to
use his enrollment-based allotments to hire a theater tech. (Id.
at 40-41.) These facts indicate that the Board both required
Hillside to use their allotments in various ways and also
expected Dr. Logan to use those limited allotments to provide
Plaintiff with the staffing he requested.

-39-

himself, through his own affiants, supports the conclusion that Hillside's discretion was limited by Defendant for nondiscriminatory reasons, that was to focus on improving academic achievement and supporting the IB magnet program. Plaintiff has come forward with no evidence that Hillside's discretion was limited in an effort to deny Plaintiff a theater tech based on his race.

After a plaintiff establishes his prima facie case, the employer "must articulate a non-discriminatory reason for the difference in disciplinary enforcement. Should the employer articulate such a non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the employer's reasons are not true but instead serve as a pretext for discrimination." Cook, 988 F.2d at 511. "Once an employer meets its burden of producing a legitimate, non-discriminatory reason, 'the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.'" Bibichev v. Triad Int'l Maint. Corp., 951 F. Supp. 2d 839, 847 (M.D.N.C. 2013) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)). "[A] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."

-40-

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). "Under the McDonnell Douglas framework, in order to survive a motion for summary judgment, the plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004) (citing Reeves, 530 U.S. at 148).

Defendant devotes the majority of its briefing to attacking Plaintiff's prima facie case as it pertains to an adverse employment action and the lack of comparator evidence. (See generally Def.'s Br. (Doc. 39).) Defendant also implicitly argues that, regardless of Plaintiff's ability to make out a prima facie case, the objective way in which teacher allotments are allocated to schools is a nondiscriminatory reason for Defendant's denial of Plaintiff's staffing request. (See id. at 21.) Defendant makes the argument more explicit in its Reply when it states that it:

> has not argued that DPS high schools have limitless
> teacher positions and are not faced with hard choices
> about staffing and programs. . . . In emphasizing
> Hillside's need for remedial courses and the existence
> of the IB program, Plaintiff is simply highlighting
> additional legitimate, non-discriminatory reasons why

-41-

Hillside[18] may have not hired another theater teacher
        to teach technical theater courses.

(Def.'s Reply (Doc. 43) at 9.) Though that argument was raised

in Defendant's Reply, Plaintiff was on notice that Defendant had

come forward with evidence of a legitimate, nondiscriminatory

reason for why Defendant's requirements limited Hillside's

discretion. (Pl.'s Resp. (Doc. 40) at 15 ("A jury must determine

whether the defense being asserted is a pretext for racially

discriminatory actions by administrators.").) "[D]istrict courts

may enter summary judgment sua sponte 'so long as the losing

party was on notice that she had to come forward with all of her

evidence.'" Penley v. McDowell Cnty. Bd. of Educ., 876 F.3d 646,

661 (4th Cir. 2017) (quoting Celotex Corp., 477 U.S. at 326);

cf. Hodgin v. UTC Fire & Sec. Ams. Corp., 885 F.3d 243, 251 n.3

(4th Cir. 2018) ("[W]e may affirm a grant of summary judgment on

any ground that the law and the record permit." (quoting Thigpen

v. Roberts, 468 U.S. 27, 29–30 (1984)). Plaintiff anticipated

Defendant's arguments and was on notice that he had to "come

forward with all of his evidence" as to an alleged pretext.

Therefore, the court analyzes Defendant's proffered

_____

        [18] Defendant never concedes that it was not high school
principals who made hiring decisions.

nondiscriminatory reason and Plaintiff's argument that the reason is pretextual.

The record contains substantial evidence that Defendant required Hillside principals to: support the IB magnet program, which was aimed at increasing racial integration; to improve standardized test scores; and to provide remedial instruction to students coming in below grade level. (See, e.g., Logan Dep. (Doc. 40-4) at 145-48, 152-53.) Indeed, the Pankey and Lassiter Affidavits provided by Plaintiff affirm that Hillside principals were required to support core subject areas, boost test scores, and support the IB magnet program. (Pankey Aff. (Doc. 40-10) ¶¶ 35-36; Lassiter Aff. (Doc. 40-11) ¶¶ 16-17.) Mr. Pankey averred that "[a]s principal, my hands were tied regarding hiring new staff. Because of decisions made by the central administration, I had no discretionary funds or teaching allotments that I could use." (Pankey Aff. (Doc. 40-10) ¶ 34.) All of Mr. Pankey's allotments "based on student population were already allocated to positions mandated by the administration and the School Board to teach the core curriculum of subjects and the specialized program (like IB) that had been placed at Hillside." (Id. ¶ 35.) Additionally, "[t]here was strong pressure to use any extra positions to enhance the reading and math skills necessary for the standardized tests." (Id.)

-43-

Mr. Pankey also averred that his teaching assistant allotments were dedicated to other "mandatory positions, such as the Exceptional Children's Program . . . and the English As a Second Language Program . . . ." (Id. ¶ 36.)

Mr. Lassiter claimed he had "little true discretion regarding allotments" for the following reasons:

> First, there was intense pressure from the administration to use the allotments for particular purposes. Many of the allotments were designated for the remedial classes needed to help low performing students in the Hillside population. Other allotments were designated for academic teachers in the International Baccalaureate program. Although I would have been happy to use one of my allotments to hire a Theatre Tech, the administration required the use of the allotments for these other purposes. These programs were a central priority of the Superintendent's office, and allotments dedicated to them were not within a principal's control.

(Lassiter Aff. (Doc. 40-11) ¶ 17.) Plaintiff does not allege or provide evidence of any other reasons Defendant might have limited principal discretion at Hillside regarding allotments.

Plaintiff argues that since the IB magnet program is designed to increase racial integration, it is "[f]or reasons related to race [that] positions at Hillside were used for academic teachers in the IB program, not for hiring a theatre tech . . . ." (Pl.'s Resp. (Doc. 40) at 19–20.) Regardless of Plaintiff's suggestion, Plaintiff must show that the proffered reason is both false and the real reason for the action was

-44-

discrimination against Plaintiff. Westmoreland v. TWC Admin.
LLC, 924 F.3d 718, 728 (4th Cir. 2019) (citing Reeves, 530 U.S.
at 144–45) (noting that a plaintiff must come forward with
"evidence as to the falsity of the employer's proffered
reason"). Rather than demonstrate any falsity of Defendant's
proffered reasons for hiring decisions or any evidence of
discrimination based on race, both Defendant's evidence and
Plaintiff's evidence establish that the hiring formulas which
precluded provision of a theater tech had nothing to do with
Plaintiff, his race, or his theater program.

Defendant's requirements were legitimate and
nondiscriminatory as to Plaintiff. Federal courts have
consistently approved magnet school plans as desegregation
tools. See, e.g., Milliken v. Bradley, 433 U.S. 267, 272 (1977);
Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 403
(4th Cir. 2001).[19] As to test scores, Mr. Lassiter noted that
Hillside was one of the schools mentioned in the North Carolina

---

[19] Plaintiff repeatedly points out that the magnet program
has not been successful in drawing white students to Hillside.
While true, the point is irrelevant. Defendant's motivation in
creating the program is legitimate, nondiscriminatory, and
completely unrelated to Plaintiff. What is more, the DPS magnet
system as a whole has been successful in increasing racial
balance across the DPS system, even if Hillside has not seen the
same success. (Doc. 40-41 at 57.)

-45-

Leandro case during which Judge Manning "mandated that Hillside
had to restructure its program and improve its test scores in
basic skills such as math and reading or be taken over by the
State." (Lassiter Aff. (Doc. 40-11) ¶ 11.) Even after
Mr. Lassiter made large improvements in test scores during his
tenure at Hillside, the passing rate was still 61%. (Id. ¶ 19.)

There is no genuine dispute of material fact that
Defendant's requirements for Hillside were legitimate and
nondiscriminatory. St. Mary's Honor Ctr., 509 U.S. at 515.
Plaintiff's rebuttal evidence, to the extent he offers it, is
"not sufficient evidence for jurors reasonably to conclude that"
Defendant's proffered reason is pretext, and summary judgment is
appropriate. Mackey, 360 F.3d at 468-69.

Mr. Pankey's and Mr. Lassiter's specific accounts of being
rebuffed by Defendant when requesting theater tech support are
tied to Defendant's push to improve academic achievement at
Hillside and support the IB magnet program. None of them create
a genuine dispute of material fact regarding pretext.

Mr. Lassiter recounts one encounter with Superintendent
Becoats, an African-American male, where he was "dismissive of
hiring a Theatre Tech for Hillside . . . ." (Lassiter Aff. (Doc.
40-11) ¶ 19.) That heated encounter does not reveal a
discriminatory intent on Defendant's part. First, it appears

-46-

that Mr. Lassiter was asking Dr. Becoats for an additional allotment, not permission to use a normal allotment for theater tech. Mr. Lassiter stated in a separate email to Plaintiff that he had 30-40 students in core subject classes, and the SIG funds were the only chance to hire a technical theater teacher. (Doc. 40-39 at 11.) If Mr. Lassiter was asking for an additional allotment for a theater tech, he was asking for something Defendant did not provide anyone else. Second, even if Mr. Lassiter was asking for permission to use an enrollment-based allotment for a theater tech instead of one for Defendant's priorities for Hillside, there are facts surrounding the event that remove any probative value as to racial discrimination against Plaintiff. Dr. Becoats is an African-American, a fact that makes its less plausible that he was denying Plaintiff a theater tech because of his race.[20] Also, Mr. Lassiter himself tied the account to concern over test scores at Hillside. At the time of the event, Hillside's pass rate on standardized tests had improved, but was still 61%. For

---

[20] Plaintiff's assertion that Dr. Becoats was going along with Defendant's allegedly discriminatory scheme to avoid standing up for a fellow African-American is a bald assertion that is not supported by the record. (Pl.'s Resp. (Doc. 40) at 12.)

-47-

these reasons, Mr. Lassiter's encounter with Dr. Becoats does not create a genuine dispute regarding pretext.

In a second account, Mr. Lassiter avers that he proposed converting a photography teacher spot to a theater tech position, but his plan was denied after an administrator reviewed enrollment numbers. (Lassiter Aff. (Doc. 40-11) ¶ 20.) This account is missing important details, such as how the position was eventually used. It appears it is related to a 2010 exchange, when Mr. Lassiter told Plaintiff that if an allotment was restored to Hillside, he was going to use it for photography/art, not for technical theater. (Key Dep. (Doc. 40-5) at 135; Doc. 40-31 at 12.) The event recounted by Mr. Lassiter is also outside the limitations period, so even if it were an actionable adverse employment action, Plaintiff is too late in raising it. The averment's scant detail, apparent connection to Mr. Lassiter's decision to use a restored allotment for another purpose, and different decisionmakers reduce that averment's probative value.

During his deposition, Plaintiff alleged that Earl Pappy, a past principal at Hillside, was told by someone in "central office" that he was not to provide Plaintiff a theater tech. (Tabb Dep. (Doc. 40-2) at 97.) Plaintiff said it was Terri Mozingo who said Hillside "was going to go in a different

direction." (Id.) In an email from Dr. Mozingo to Plaintiff, Dr. Mozingo told Plaintiff that, at the time in 2009, Hillside had a need for Math and English teachers. (Doc. 40-31 at 8.) Mr. Pappy was on the same email chain that apparently stretched over a year. (Id. at 9-10.) This encounter is both outside the limitations period and does not create a genuine factual dispute about whether Defendant denied technical staffing to Plaintiff because of his race.

Plaintiff has failed to come forward with evidence that Defendant's requirements which limited Hillside's discretion were pretextual reasons for discriminating against Plaintiff based on his race. There is no genuine dispute of material fact that Defendant required Hillside principals to boost academic achievement and support a magnet program aimed at improving racial integration. There is no genuine dispute of fact that these reasons were not false, nor could any reasonable jury conclude that "discrimination was the real reason" for the requirements. St. Mary's Honor Ctr., 509 U.S. at 515. Plaintiff has failed to come forward with evidence showing pretext as to Defendant's reasons for limiting Hillside's use of its enrollment-based allotments.

### iii. No Comparators during the Limitations Period

Plaintiff has also not come forward with comparator evidence that would lead a reasonable jury to conclude that Defendant acted with discriminatory intent toward Plaintiff.[21] McLean, 332 F.3d at 719. The undisputed facts reveal that, during the relevant limitations period, there were no Caucasian comparators who received preferential treatment.

Plaintiff filed the Complaint on August 9, 2017. (Doc. 1.) The parties agree that § 1981's statute of limitations has run on any claims that occurred prior to August 9, 2013 and of which Plaintiff was aware. (Pl.'s Resp. (Doc. 40) at 7; Def.'s Reply

---

[21] Plaintiff points repeatedly to DPS's long struggle with race and equity. Plaintiff presents evidence that Hillside is and always has been underfunded and under-resourced due to its racial make-up. These arguments are not probative of any racial animus by Defendant toward Plaintiff as an individual. See Ricci v. DeStefano, 557 U.S. 557, 577–78 (2009); Chi. Teachers Union, Local 1 v. Bd. of Educ. of City of Chi., 419 F. Supp. 3d 1038, 1044, 1057 (N.D. Ill. 2020), appeal docketed, No. 20-1167 (7th Cir. Jan. 31, 2020) ("But under a disparate treatment theory, plaintiffs must prove that the statistical disparity is the result of intentional discrimination, and in this case, as the Court has explained, the statistical evidence is rebutted in that regard by undisputed evidence that the layoffs were not the product of intentional discrimination; rather, they were the product of a regular bureaucratic process by which the number of positions and amount of funding allocated to particular schools dropped when the schools' enrollment dropped, which triggered layoffs if the drop in positions and funding impelled individual principals to close positions to balance school budgets." (emphasis added)).

(Doc. 43) at 2 n.1.) This court agrees. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 371, 382 (2004) (noting that a four-year statute of limitations applies to § 1981 claims brought pursuant to the 1991 amendments to § 1981); Delaware State Coll. v. Ricks, 449 U.S. 250, 258 (1980) (noting that the unlawful practice occurs when the plaintiff is informed of the allegedly discriminatory practice or decision).

As to Title VII, its enforcement provisions state that "[a] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109-10 (2002) (stating that "a litigant has up to 180 or 300 days after the unlawful practice happened to file a charge with the EEOC," depending on whether the litigant also files their complaint with a state agency). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113. For Title VII, the 180-day window "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982) (footnote omitted). It is Plaintiff's burden to show that any tolling or estoppel defenses applies.

-51-

See, e.g., Farris v. Shinseki, 660 F.3d 557, 563 (1st Cir. 2011); Ramirez v. City of San Antonio, 312 F.3d 178, 183 (5th Cir. 2002); McCorkle v. BEB Wright, No. 5:17-CV-117-BO, 2017 WL 3594256, at *2 (E.D.N.C. Aug. 21, 2017); Fulmore v. City of Greensboro, 834 F. Supp. 2d 396, 415 (M.D.N.C. 2011). Plaintiff signed his Charge of Discrimination on May 12, 2016; it was received by the EEOC on May 18, 2016. (Doc. 40-16 at 1.) Plaintiff does not argue that his discriminatory staffing claim is a continuing violation, nor is the court aware of any case that would support that argument. Plaintiff makes no argument for equitable tolling or estoppel. Therefore, Plaintiff's Charge is untimely as to any acts of discrimination that took place prior to November 20, 2015.

The court continues to find that DSA is not a valid comparator.[22] There is no genuine dispute as to the following

---

[22] The court continues to find that DSA is an invalid comparator and that it should not reconsider its previous judgment, see Jiangment Kinwai Furniture Decoration Co. v. IHFC Props., LLC, No. 1:14-CV-689, 2015 WL 12911532, at *1 (M.D.N.C. May 8, 2015) ("[T]he Court will not reward or countenance second bites at the apple."), though the record indicates even DSA used its normal allotments to hire its theater staff.
    To help achieve racial balance in its high schools, Defendant established magnet programs at DSA, Hillside, and other schools in the district. (Key Dep. (Doc. 40-5) at 31; Forte-Brown Dep. (Doc. 40-9) at 28–29.) This goal has been
                                        (Footnote continued)

material facts for Jordan and Riverside's staffing from

August 9, 2013, until August 9, 2017.

During the relevant period, Jordan had one Caucasian

theater teacher, Olivia Bellido. (Crabtree Dep. (Doc. 40-3) at

158; Bellido Aff. (Doc. 43-1) ¶ 3.) Ms. Bellido has been the

only theater teacher at Jordan since 2011. (Bellido Aff. (Doc.

---

largely attained at DSA, where the student population in 2016
was 35.7% African-American, 35.2% white, and 21.9% Hispanic.
(Doc. 40-41 at 126.)

    However, DSA was established "not to bring just white
students. [DSA] was created to bring a central focus on a
program that dedicated itself just to arts, a focus on arts."
(Forte-Brown Dep. (Doc. 40-9) at 26.) DSA is a "[s]pecialized
visual and performing arts secondary school for grades 6-12
focused on rigorous academics and excellence in the visual and
performing arts." (Doc. 40-41 at 125.) High school students at
DSA must declare an art concentration that they pursue all four
years, one of which is theater. (L'Homme Dep. (Doc. 40-6) at
83.) Magnet positions are given to DSA to support its magnet
program, but they are not designated for theater. (Key Dep.
(Doc. 40-5) at 170.) In 2016, DSA only received three magnet
positions in addition to its normal allotment. (Doc. 40-41 at
125.) Almost all of the theater teachers and techs at DSA
support both the middle and high school drama programs. (Casey
Dep. (Doc. 40-8) at 56.)

    DSA's high school and middle school arts focus explains
staffing disparities between it and Hillside. Hillside is not an
arts magnet program, but an IB magnet program. The requirement
that DSA students pick an art concentration means more students
are participating in arts programming, requiring more art
teachers, including theater teachers and techs. These
differences make DSA an invalid comparator from a staffing
perspective, even if Plaintiff has built a drama program of
equal (or even surpassing) artistic quality. Finally, as evinced
by the few magnet positions given to DSA, even DSA did not
receive theater tech allotments from Defendant.

43-1) ¶ 3.) Despite Ms. Bellido's repeated requests, Jordan has not hired a theater tech. (<u>Id.</u> ¶¶ 7-8.)

As for Riverside, starting on August 9, 2013, Riverside had two drama teachers: Kee Strong, a Caucasian female, and Monique Taylor, an African-American female. (Casey Dep. (Doc. 40-8) at 34-35.) Andrew Way worked as a theater tech at Riverside from 2013 until June 2015. (Adkins Aff. (Doc. 38-8) ¶ 7.)[23] Mr. Way and Ms. Strong both left Riverside in June 2015, (Casey Dep. (Doc. 40-8) at 35; Adkins Aff. (Doc. 38-8) ¶ 7), leaving just Ms. Taylor. Tom Nevels was then hired to work at Riverside but was only there for several weeks in fall of 2015. (Crabtree Dep. (Doc. 40-3) at 143), once again leaving just Ms. Taylor. On January 4, 2016, Will Holley started work as a classified theater tech; he is still at Riverside. (<u>Id.</u> at 135-36.)

---

[23] Plaintiff's argument that Ms. Taylor and Mr. Way were both hired to support Ms. Strong is unsupported by the record. Ms. Taylor was hired as a theater teacher before Mr. Way was hired. Ms. Strong, though she had been at Riverside longer, was not Ms. Taylor's supervisor. Defendant has produced unrebutted evidence that Ms. Strong and Ms. Taylor were both "theater teachers." (Adkins Aff. (Doc. 38-8) ¶ 6.) Plaintiff has produced no evidence to establish that Ms. Strong supervised Ms. Taylor. Ms. Taylor's sealed personnel file includes no evaluation forms or other evidence that might indicate that Ms. Strong supervised Ms. Taylor. (<u>See generally</u> Doc. 42-9.) In making his argument, Plaintiff cites only to a page in Ms. Taylor's file that lists her as a "Teacher-Theater Arts." (Pl.'s Resp. (Doc. 40) at 16; Doc. 42-9 at 32.)

-54-

Plaintiff's claim is one for disparate treatment as compared to white teachers. Plaintiff has no direct evidence of discrimination but proceeds under the McDonnell Douglas framework to prove discrimination using indirect evidence. Plaintiff has failed to come forward with valid comparator evidence that white teachers received the benefit Plaintiff sought. See Gerner, 674 F.3d at 266 (quoting White, 375 F.3d at 295); see also Cox v. U.S. Postal Serv. Fed. Credit Union, No. GJH-14-3702, 2015 WL 3795926, at *3 (D. Md. June 17, 2015) ("[A] plaintiff . . . who bases her allegations entirely upon a comparison to another employee must demonstrate that the comparator was similarly situated in all relevant respects."). Indeed, the only comparator school that hired any theater techs from August 9, 2013, until August 9, 2017, was Riverside. Riverside hired a theater tech to support an African-American teacher and a Caucasian teacher, and then hired another tech to support just an African-American teacher. As for Title VII, there was no staffing at comparator schools within 180 days of May 18, 2016, that supports the conclusion that Plaintiff was

discriminated against.[24] The only drama teacher at a comparator
school who had technical theater support during that time was
Monique Taylor, an African-American female.

Plaintiff has failed to demonstrate that there is a genuine
issue of material fact that Defendants gave a theater tech to a
Caucasian teacher when it did not give him one. That Defendant
gave a theater tech to another African-American teacher belies
Plaintiff's theory and evidence of discrimination. Summary
judgment is appropriate on Plaintiff's technical staffing claims
because no reasonable jury could conclude, based on the facts
during the limitations period, that Defendant acted with
discriminatory intent towards Plaintiff. McLean, 332 F.3d at
719.[25] Plaintiff has failed to show there is a genuine dispute of

---

[24] It is not clear when Plaintiff made his final request for
a theater tech. Plaintiff cites Ms. Casey's testimony that
Plaintiff was asking for a theater tech the entire time she was
employed by DPS; Ms. Casey retired in June 2019. (Casey Dep.
(Doc. 40-8) at 9, 89.) It is clear from the record that within
180 days of filing his EEOC charge on May 18, 2016, the only
drama teacher at a comparator school with a theater tech was
Monique Taylor, an African-American female.

[25] Plaintiff argues that the nondiscriminatory treatment of
one member in the protected class does not mean that another
protected member was not discriminated against. To support that
contention, Plaintiff cites to Davis v. Greensboro News Co.,
Civ. No. C-84-613-G, 1985 WL 5342 (M.D.N.C. Nov. 13, 1985), a
case where an African-American employee was fired and then later
replaced by another African-American. In Brown v. McLean, 159
                                        (Footnote continued)

-56-

material fact "that similarly-situated employees outside the protected class received more favorable treatment" during the limitations period. Gerner, 674 F.3d at 266 (quoting White, 375 F.3d at 295). No reasonable jury "could return a verdict for the nonmoving party on the evidence presented." McLean, 332 F.3d at 719.

### c.   Adverse Employment Action Conclusion

In conclusion, the court does not find that Hishon supports the conclusion that Defendant took an adverse employment action. A theater tech does not appear to be "part and parcel" of employment as a high school drama teacher in DPS.

Regardless, there is also no genuine dispute of material fact that all theater techs at comparator schools were hired using those schools' enrollment-based allotments. There is no genuine dispute of material fact that no school ever received an additional allotment for a theater tech beyond its enrollment-

---

F.3d 898, 905 (4th Cir. 1998), the Fourth Circuit addressed the same principle and listed "exceptions" to the requirement that a wrongful termination plaintiff show they were replaced by someone outside the protected class. Plaintiff does not argue those exceptions apply to his dissimilatory staffing claim. Further, Davis and the later Fourth Circuit cases require a court to avoid summarily dismissing wrongful termination claims because a member of the protected class was hired to replace a plaintiff. Those cases do not require a court to ignore an extended pattern where a member of the protected class repeatedly received the noncontractual benefit Plaintiff sought.

based allotment, nor did another school receive extra funds to hire a classified employee to act as a theater tech. In short, there is no genuine dispute as to whether the Board provided a benefit to another school that it did not provide to Plaintiff; it did not. Defendant cannot be held liable for denying Plaintiff's request for an additional allotment for a theater tech when it did not provide it to anyone else. See Hishon, 467 U.S. at 75.

As to Hillside's use of its enrollment-based allotments, even assuming Defendant's actions in fact dictated the hiring decisions, there is no genuine dispute of material fact Defendant's IB magnet program requirements, standardized test score improvement efforts, and other academic achievement goals were legitimate, nondiscriminatory reasons for limiting Hillside's discretion as to it enrollment-based allotments. Plaintiff's evidence, far from showing falsity, supports the legitimacy of Defendant's efforts, and Plaintiff has failed to come forward with any evidence that Defendant's requirements for Hillside were related to him in any way. To the extent that Plaintiff's staffing claims rests on Defendant's limitation of Hillside's discretion, the evidence is not such that a "juror could reasonably base a finding that discrimination motivated the challenged employment action." Mackey, 360 F.3d at 469.

**B.** __Extra Duty Pay__

Plaintiff has also failed to come forward with evidence establishing a genuine dispute of a material fact on his extra-duty claim — specifically, Plaintiff has failed to come forward with any evidence "that similarly-situated employees outside the protected class received" extra-duty pay when he did not. Gerner, 674 F.3d at 266 (quoting White, 375 F.3d at 295). Most of Plaintiff's evidence supporting his extra-duty pay claim are his own pleadings and sworn statements. These are insufficient in light of the evidence produced by Defendant.

The party moving for summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp., 477 U.S. at 322). If the moving party meets their burden, "[t]he burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718–19. "The responding party 'may not rest upon mere allegations or denials of his pleading, but must come forward with specific facts showing that there is a genuine issue for trial.'" Jefferies v. UNC Reg'l Physicians Pediatrics, 392 F. Supp. 3d 620, 625 (M.D.N.C. 2019) (quoting Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008)). "Mere unsupported speculation is not sufficient to defeat a

summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." <u>Francis v. Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 308 (4th Cir. 2006).

Plaintiff's allegations in his Verified Amended Complaint states the following:

> Upon information and belief, the white Theatre Directors and other white teachers working in the theatre programs at Riverside, Jordan and Durham School of the Arts (identified above) have either not been asked to do this same type and volume of unpaid extra work or have been paid an extra-duty payment or a contractual payment for performing this type of work.

(Am. Compl. (Doc. 14) ¶ 132.) When questioned during his deposition, however, Plaintiff only named two Caucasian individuals who he claimed received extra-duty pay when he did not: Will Holley and Bill Thomason.[26] (Tabb Dep. (Doc. 40-2) at 74.) In opposing Defendant's Motion for Summary Judgment, Plaintiff points to only one Caucasian comparator who, Plaintiff

---

[26] Plaintiff did not provide any evidence, other than his allegations, about a specific district event Mr. Thomason received extra-duty pay for working. Plaintiff does not rely on any comparisons to Mr. Thomason in his Response. (<u>See</u> Pl.'s Resp. (Doc. 40) at 22.)

The record also includes an uncompleted copy of an extra-duty contract for a Jeffrey Whicker. (Doc. 40-34 at 3.) Plaintiff does not cite to this form, it is not clear who Jeffrey Whicker is, and the form is for an event in 2019, after Plaintiff admits he regularly started receiving extra-duty contracts.

alleges, was given extra-duty pay when Plaintiff was not: Will Holley of Riverside High School. (See Pl.'s Resp. (Doc. 40) at 22.) However, the evidence neither supports the conclusion that Mr. Holley was paid when Plaintiff was not, nor does it support the conclusion that Mr. Holley is a valid comparator.

Plaintiff has only come forward with evidence that Mr. Holley was given extra-duty pay once for working at a District event; Defendant has come forward with evidence that Plaintiff was paid for one district event and received an extra-duty contract for another. There is no genuine dispute of material fact "that similarly-situated employees outside the protected class received" extra-duty pay when he did not. Gerner, 674 F.3d at 266 (quoting White, 375 F.3d at 295).

Plaintiff points to one extra-duty contract Mr. Holley was given for a District CTE awards event on May 1, 2018. (Doc. 40-16 at 117.)[27] That single extra-duty contract for Mr. Holley's work on one district-wide event does not support Plaintiff's contention that Mr. Holley was paid more frequently or better than Plaintiff was, because Defendant has provided record

---

[27] Four other extra-duty forms were provided, but those are for facility rentals. (See Doc. 40-16 at 115, 116, 118, 119.) Plaintiff does not claim he was not paid for facility rentals.

-61-

evidence that Plaintiff himself received at least two different extra-duty contracts in 2015 before Mr. Holley even started working at DPS on a fulltime basis. (Tabb Dep. (Doc. 40-2) at 60, 111, 113; Doc. 40-15 at 26-31).[28] Other than those two specific events for which Plaintiff received extra-duty contracts, Plaintiff also acknowledged at his July 2019 deposition that Defendant was "paying [him] now" for extra-duty work done at District events. (Tabb Dep. (Doc. 40-2) at 65.) On March 28, 2017, Plaintiff received another request to complete an extra-duty contract for a district event. (Doc. 40-34 at 4-5.) That request came before Plaintiff filed the present suit, but after Plaintiff filed his EEOC Charge. (See Doc. 40-16 at 1.) There is no genuine dispute that Plaintiff was given extra-duty contracts prior to filing his suit and before any contracts offered to Mr. Holley. There is no dispute that, based on the

---

[28] The copies of the 2015 extra-duty contracts provided by Defendant had not yet been completed by DPS personnel, meaning they do not independently establish that Plaintiff was paid, only that he requested payment. Plaintiff stated he was paid for the 2015 Summer School graduation. (Tabb Dep. (Doc. 40-2) at 60, 111.) Plaintiff does not recall if he was actually paid for the 2015 CTE event. (Id. at 113.) Plaintiff has never specifically alleged that he submitted an extra-duty contract only to have it denied by Defendant, but instead that he made broad requests for more extra-duty pay. (Id. at 65; see also Am. Compl. (Doc. 14) ¶ 74.)

-62-

record Plaintiff has come forward with, Plaintiff got two extra-duty contracts when Mr. Holley got one.

Further, Mr. Holley's uncontroverted testimony is that he, too, sometimes worked District events without receiving any extra-duty pay, (Holley Dep. (Doc. 40-7) at 77), an unrefuted assertion that further undermines Plaintiff's claim of disparate treatment. Plaintiff has failed to come forward with evidence supporting his allegation that Mr. Holley was paid more often than Plaintiff or somehow treated differently.

Mr. Holley and his company's contract-based work for DPS does not serve as a basis for Plaintiff's claim. As for the work Mr. Holley was paid for prior to his employment with DPS, it was done on a contractual basis. (Id. at 29.) Mr. Holley's payment during that period cannot support Plaintiff's claim because he was not a similarly-situated employee, but an outside contractor.

Mr. Holley's earnings through contracts between DPS and his companies also does not support Plaintiff's extra-duty pay claim. During the time before Mr. Holley was hired by Defendant, Ferret Sound's predecessor, Holley Johnson Sound, Lighting and Production Company, received a contract to support DPS's "Evening of Entertainment" at the Durham Performing Arts Center. (Id. at 48-50.) After Mr. Holley was hired at Riverside, DPS

-63-

continued that contract with Ferret Sound for the Evening of
Entertainment. (Id. at 54–55, 63.) That DPS contracted with
Ferret Sound, an external entity, has no bearing on Plaintiff's
claim that he was denied extra-duty pay while Caucasian teachers
were given it. Holley noted in his deposition that the contract
between Ferret Sound and DPS was a "different contract" than his
extra-duty contract. (Id. at 49.) Payments made to Ferret Sound
were not extra-duty payments for overtime work done by a DPS
employee; they were the product of an external contract. Ferret
Sound is therefore not a valid comparator because it is not a
"similarly situated employee[] outside [Plaintiff's] class
. . . ." Prince-Garrison v. Md. Dep't of Health & Mental
Hygiene, 317 F. App'x 351, 353 (4th Cir. 2009).[29]

Finally, even if Plaintiff had come forward with evidence
that Mr. Holley was treated better than he, Mr. Holley is an
invalid comparator due to Defendant's classification of
Mr. Holley under the Fair Labor Standards Act ("FLSA"); that
classification makes him more likely to have received extra-duty
pay for after-hours work.

---

[29] Plaintiff does not contest the propriety of using outside
contractors, nor could he. Plaintiff himself used and paid
outside contractors to support Hillside's drama program. (Casey
Dep. (Doc. 40-8) at 52.)

-64-

The overtime provisions of the FLSA do not apply to: "any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools) . . . ." 29 U.S.C. § 213(a)(1). "Those faculty members who are engaged as teachers but also spend a considerable amount of their time in extracurricular activities such as coaching athletic teams or acting as moderators or advisors in such areas as drama, speech, debate or journalism are engaged in teaching." 29 C.F.R. § 541.303(b) (emphasis added). Defendant's 2018–19 employee handbook stated that "[n]onlicensed employees should not work in excess of assigned hours without permission . . . of the supervisor. . . . [N]on-exempt employees will be granted compensatory time in lieu of compensation for hours worked in excess of 40 hours per work week." (Doc. 40-48 at 51.)

Plaintiff appears to clearly fit into the FLSA's teacher exemption. By contrast, Mr. Holley is not a certified teacher, but a classified employee. (Holley Dep. (Doc. 40-7) at 66.) For that reason, according to DPS's Executive Director of Budget Development and Data Analytics, Mr. Holley is considered a

-65-

non-exempt employee under the FLSA. (Modestou Aff. (Doc. 38-9) ¶ 11.)[30]

Plaintiff does not dispute Defendant's classification of Mr. Holley, nor does Plaintiff dispute that Defendant has consistently classified Mr. Holley as non-exempt. Plaintiff only argues that the classification is a distinction without merit since the record does not reflect that Plaintiff was asked to work overtime because he was an exempt employee. (Pl.'s Resp. (Doc. 40) at 22.) However, Mr. Holley's status as a non-exempt employee, along with Defendant's awareness of the FLSA implications, would make it more likely that Defendant's administrative personnel ensured Mr. Holley received extra-duty contracts, explaining any additional efforts made by Defendant to see that he received an extra-duty contract. (See Holley Dep. (Doc. 40-7) at 57 (noting that DPS personnel would send him an extra-duty contract without him having to request one).) Whether Plaintiff was asked to support events because of his exempt status is irrelevant; Mr. Holley's FLSA status and Defendant's awareness of it makes him an invalid comparator.

---

[30] Whether this classification is correct is irrelevant to this court's analysis; what matters is that Defendant believed Mr. Holley to be non-exempt, explaining any difference in treatment as to extra-duty pay.

In addition to Plaintiff's failure to come forward with evidence creating a genuine dispute as to whether similarly-situated Caucasian employees were treated better, Defendant offers uncontroverted evidence that Plaintiff was not discriminated against as to extra-duty pay. Ms. Bellido, the Caucasian female theater director at Jordan, averred that she does "not receive any extra-duty pay" for her technical theater support at district events. (Bellido Aff. (Doc. 43-1) ¶ 11.)

Further, Plaintiff was paid $11,000.07 in extra-duty pay during the period from the 2009-2010 school year until the 2018-2019 school year. (Modestou Aff. (Doc. 38-9) ¶ 10.) Of that total, Plaintiff has come forward with evidence that $5,978.75 was for facility rentals, (Doc. 40-17 at 16-20), a category of pay that Plaintiff does not contest. Subtracting that total, Plaintiff earned $5,021.32 in extra-duty pay during the period. Since Plaintiff was apparently paid $30 per hour for extra-duty, (Doc. 40-15 at 27), that equates to 167 hours of extra-duty pay for which he was compensated, the equivalent of twenty eight-hour days of extra-duty work. "No other performing arts teacher in the district earned more than $2,076 in extra-duty

pay during the same time-period." (Modestou Aff. (Doc. 38-9) ¶ 10.)[31]

Plaintiff offers no evidence to contest those figures. Plaintiff's allegation that "the white Theatre Directors and other white teachers working in the theatre programs at Riverside, Jordan and Durham School of the Arts" were paid when Plaintiff was not is untenable in light of the fact that Plaintiff earned more than double in extra-duty pay than any other teacher over the same period.[32]

In sum, Plaintiff has failed to come forward with any evidence to support his extra-duty pay claim beyond his own

---

[31] Plaintiff alleges that the "bulk" of that amount comes from facility rentals. (See Pl.'s Resp. (Doc. 40) at 25 n.5.) The cited portions of Plaintiff's deposition do not include any specifics as to the breakdown of his total extra-duty pay. As computed above, the invoices for facility rentals show that Plaintiff earned almost the same amount from facility rentals that he did from extra-duty pay.

[32] This is especially true given the fact that Ms. Bellido, Jordan's white theater teacher, was at Jordan from the 2009-2010 school year until the 2018-2019 school year. (Bellido Aff. (Doc. 43-1) ¶ 2.) No argument can be made that she made less in extra-duty pay because she was not present during the entire period cited by Mr. Modestou. Plaintiff offers no evidence about which, if any, DSA teachers received extra-duty pay when he did not. Mr. Modestou stated that "[n]o other performing arts teacher in the district earned more than $2,076 in extra-duty pay during the same time-period[,]" (Modestou Aff. (Doc. 38-9) ¶ 10 (emphasis added)), a statement that would presumably include DSA. Plaintiff has offered no evidence or argument to suggest that it does not.

-68-

pleadings and allegations. Plaintiff has also failed to identify any Caucasian comparators to support his claim that he was denied extra-duty pay due to his race. Defendant, by contrast, has offered undisputed evidence that comparable Caucasian teachers were treated the same as Plaintiff when it came to extra-duty contracts and pay. Indeed, Defendant has also offered undisputed evidence that Plaintiff has been treated even better than his fellow teachers in the amount of extra-duty pay he has earned. "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." Francis, 452 F.3d at 308. Summary judgment, therefore, should be granted as to Plaintiff's extra-duty claim.

## IV.  **CONCLUSION**

Plaintiff has failed to come forward with evidence establishing a genuine dispute of material facts as to his remaining claims. Plaintiff has adduced no evidence "that similarly-situated employees outside the protected class received more favorable treatment" during the § 1981 or Title VII limitations period. Gerner, 674 F.3d at 266 (quoting White, 375 F.3d at 295). Plaintiff has failed to come forward with evidence showing there is a genuine dispute of material fact as to whether Defendant provided an additional theater tech

-69-

allotment to any other school or teacher. And Plaintiff has failed to come forward with evidence showing that Caucasian comparators were given extra-duty pay when he was not. Summary judgment should be granted "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." McLean, 332 F.3d at 719 (citing Liberty Lobby, 477 U.S. at 247-48). A reasonable jury could not return a verdict of Plaintiff on this record.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (Doc. 38), is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE.**

A judgment reflecting this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 28th day of September, 2020.

_____
        United States District Judge